KNOLL, Justice.
I,On February 24, 2006, a West Baton Rouge Parish grand jury indicted defendant, Michael Garcia, for the February 8, 2006, first-degree murder of Matthew Mil-lican (“Matt”), a violation of La.Rev.Stat. § 14:3o.[1] During his arraignment on March 3, 2006, defendant entered a plea of not guilty.[2] Defendant’s jury trial commenced on June 4, 2008. During trial on the merits, the presentation of the State’s case unfolded in a chronological fashion with five witnesses testifying to other unadjudicated crimes, including threats, aggravated battery, rape, and murder perpetrated by defendant while armed with a machete against victims in Michigan and Florida, followed by four witnesses who had exclusive knowledge of Matt’s murder. Thereafter, the defense called four guilt phase witnesses and then rested, concluding the presentation of evidence on June 6, 2008. After hearing closing arguments, receiving the District Court’s loinstructions, and deliberating defendant’s guilt for eleven minutes, the jury returned a unanimous verdict of guilty of first-degree murder.
Trial on the penalty phase began on June 7, 2008. Following the presentation of evidence, the jury unanimously returned a verdict of death, finding the offense was committed (1) while defendant was engaged in the perpetration or attempted perpetration of an armed robbery,[3] and (2) while defendant was engaged in the perpetration or attempted perpetration of an aggravated kidnapping.[4] The District Court denied defendant’s motion for new trial on July 7, 2008, and sentenced defendant to death in accordance with the jury’s verdict on July 8, 2008.
Under La. Const, art. V, § 5(D), defendant directly appeals his conviction and death sentence, raising eighty-five assignments of error. We will address the most significant errors in this opinion, and the remaining errors will be addressed in an unpublished appendix. After a thorough review of the law and the evidence, we affirm defendant’s first-degree murder conviction and the imposition of the death sentence for the following reasons.
*6 FACTS[5]
The facts of the tragic and heinous offenses committed by the defendant and his “lieutenants” are violent and disturbing. Within a world of transients, drifters, | .¡carnival workers, vagabonds, drunks, and drug abusers, Matt[6] lived a traveler’s lifestyle, a voluntarily homeless existence, which took him throughout the United States. Early in February 2006, this traveler returned to West Baton Rouge Parish, where he had been reared, in anticipation of marrying his fíancée and traveling companion, M.T.[7] Even though Matt’s family lived nearby, the couple, with their four-month-old pitbull-mix puppy, chose to stay outdoors and slept in an abandoned Texaco station near the south end of Louisiana Highway 415. There, they met and befriended a fellow drifter known to them as “Hollywood.”[8]
On the afternoon of February 7th, while M.T. and Matt were out panhandling at the nearby Wal-Mart, Hollywood saw three men walking past the abandoned gas station and invited them in for a drink. Defendant, his brother, Danil Garcia, and their friend, James Nelson, II, (also known as “Fatboy”),[9] had been heading west from Florida and were also sleeping outside since the stolen motor home they were driving broke down. M.T. and Matt first encountered the trio when they returned to the abandoned Texaco station that evening and joined the group for drinks. Af-terwards, M.T. and Matt moved their mattresses over Lbehind the Super 8 Motel next door.[10] Around 9:45 that evening, M.T. went to Arb/s to buy sandwiches for the couple’s dinner. Once they had finished eating, Hollywood approached the couple and asked if he could sleep back there with them. They agreed and made a bed for him next to the couple’s mattress. The three of them then prepared to go to sleep by turning on their radio and covering themselves with blankets.
Later, during the early morning hours, defendant told his brother and Nelson, both of whom defendant referred to as his lieutenants,[11] that he wanted to rob the *7 couple.[12] Armed with knives and machetes, the three strangers “ripped” the covers off of Matt and M.T., waking the couple to the sight of three men standing over them with blades drawn.[13] Holding his blade to Matt’s throat,[14] defendant first warned the couple “to be quiet” and to “keep the dog quiet” as well, and then walked Matt farther down the wall of the Super 8 Motel, where he demanded Matt give him all his money. After taking $20 from Matt, defendant returned to M.T., asking “where’s the money?” In response, she gave him all the money in her pockets, $10 all in ones, and was then forced to join Matt on the wall. | ¡All the while, the trio was careful not to disturb Hollywood, who was passed out about six to eight feet away.[15]
Next, after blindfolding the couple with the pillowcases they had been sleeping on, the trio, with defendant leading Matt and Nelson leading M.T., marched their victims deep into the woods. On this terrorizing trek, the silence was broken by the couple’s pleas for mercy and the “swooshing” of Danil’s machete swiping against bushes and branches.[16] When defendant asked the couple, “Do you know what that sound is?” Matt answered, “it’s the sound of a big knife cutting things. And [defendant's like, ‘that’s right, and [I’m] not afraid to use it.’” Periodically, the men would also remove the blindfolds, shine their flashlights in their victims’ faces, always with their machetes in clear view, and ask them if they knew where they were; they also kept “stopping and turning around,” all in an attempt to intimidate and disorient the couple.
Upon arriving at the scene of the subsequent battery and assault, the three men tied Matt and M.T. to a tree, using Matt’s bootlaces as ligatures. All the while, defendant kept up a rambling diatribe, questioning the couple, “you don’t know whether you’re going to live or die, do you?” and stating “he wanted everybody to know that they weren’t a joke.” When the puppy started crying, defendant threatened to kill the dog and make Matt drink her blood, but eventually M.T. was untied to hold the puppy and keep her quiet.
Again using Matt’s bootlace, defendant next hog-tied Matt’s neck to his wrists, which were already bound together behind his back, and then asked, “Well, lfiwhat do you think we should do with you guys?” Matt responded, “Well, hopefully, you can just tie us up out here together and go on your way.”[17] Standing Matt up, defendant then began tormenting him, asking him “do you have heart?” Matt replied, “I try to.” At this point, defendant punched him in the stomach and asked Matt again *8 did he have heart. When Matt responded, “I don’t know what you mean,” defendant stated, “I think you are being smart with me,” and started hitting and kicking Matt, who at some point fell to the ground. Defendant then pummeled Matt in the face with his fists. Picking up a log, defendant dropped it on Matt’s head twice, causing his body to flop over, and asked M.T.: “Do you think I’m f — ing joking?” She responded, “No, no.” The men also hit Matt in the head with the beer bottles from which they had been drinking.
The focus of the assault then turned to M.T. when the trio stood her up by a tree and defendant hit her in her “crotch,” asking “when was the last time that’s been hit?” When M.T. replied, “the night before,” defendant quipped, “Do you know when the next time is ... take a wild guess ... in about two minutes.” The three men then pulled M.T.’s shirt off and shoved her bra down. Nelson and Danil began “sucking on [her] nipples,” but defendant ordered them to bring her over in front of where they had tied Matt to the tree so “he can see.” Matt was laying face down on the ground at this point, so they propped his head up. Defendant then ordered M.T. to tell Matt that he was “not to move or do anything stupid and that he had to watch.” Matt reassured her: “Okay, Baby, I love you.”
The men then made her take off the rest of her clothes. First, Danil forced her to “suck his d — .” When Danil did not achieve orgasm, defendant became angry, hitting Danil “on the back with the back of the machete.” Danil got mad 17then, saying “screw this” and putting his pants on. An argument ensued between the brothers, ending with defendant ordering Danil: “Go finish your business.” Danil then returned to M.T.’s mouth until he ejaculated. Next, defendant demanded oral sex, and at the same time, Nelson raped M.T. vaginally and anally. Defendant then ordered M.T. to “turn around and give [Nelson] head.” While she was performing oral sex on Nelson, defendant raped her vaginally and anally. As a result of defendant’s “f — ing her up the ass,” M.T. defecated on his penis, and in an act of utter degradation, defendant forced her to clean her own fecal matter off his penis with her mouth and then ejaculated therein.[18] Unquestionably “under threat and intimidation,” M.T. did what the men asked because “they said they were going to kill us,” “[t]hey all had knives and they kept threatening [the couple and her puppy],” but most specifically she “was doing it so that they wouldn’t hurt Matt.” Basically, “[she] let them dog [her] out in hopes that [she] would save his life.”[19]
Throughout the assault, Matt renewed his pleas for mercy, and at some point during the ongoing rape, Matt even “tried to do something,” which prompted defendant and Nelson to jump over to him with defendant asking Matt, “What the f— was that?” The men then started “kicking him and stuff.” “Just so they would leave him alone,” Matt yelled he was having a seizure, which only prompted more hitting *9 and kicking from the men. M.T., concerned “they were getting the better of |sMatt and his face was really swollen,” kept yelling for them to leave him alone and even threatened she “wouldn’t do anything if they kept hurting Matt.”
At this point, defendant, armed with his K-bar knife, untied Matt from the tree, and with Nelson holding Matt up on the other side, defendant marched Matt further into the woods. Danil with his machete stayed back to guard M.T. and tried to make her “give him oral sex,” but she refused because she did not know what they were doing to Matt and “wasn’t going to cooperate with them if they hurt Matt.” Danil permitted M.T. to put her clothes back on then, and when she asked if they were going to kill Matt, he reassured her: “No, no, they are not going to kill him, they are just going to tie him to a tree and he’ll be able to get loose in the morning.” However, the men were gone for a while, during which time both M.T. and Danil heard Matt scream in pain.
According to Nelson, defendant continued to lead Matt from behind until the two ended up walking off the side of the bank of the Intracoastal Canal, sliding down the brush-lined embankment to stand on the muddy edge of the water.[20] Stepping out of the hole he had tripped into,[21] Nelson joined the men on the water’s edge and saw defendant try to force Matt to sit down facing the water. When Matt pushed backward, defendant “end up reaching up over his shoulder and end up stabbing the dude in the chest” with his El-bar knife. Only the sound of Matt’s lungs “wheezing” could be heard as defendant pulled the knife from Matt’s chest. Defendant then pushed Matt’s body, face down, into the water, and “swooshed” the knife around in the water to clean the blade. Nelson, in an effort to “get rid of the body,” walked out into the water “a little ways and pushed him farther out ... hoping [his body] would float down the water.” When the two Rfínally returned to where Danil and M.T. were waiting, the legs of their pants were wet and they were wringing out the gloves they had been wearing. Danil asked them what happened, and. they just laughed about tripping and falling into a puddle.
In desperation, M.T. asked if they would just leave her with Matt, “just tie me up with Matt and leave.” In response, defendant inquired, “Do you want to be in the same position that Matt is?” She replied, “If you’ve killed him, no ... And he 'said that what was going to happen was that [M.T.] was going to walk back with them and ... was going to have to stay with them.” Whether they were going to let her go “depend[ed] on how well [she] followed] direction.”
The three men, still armed with knives and machetes, then marched M.T. back to the abandoned gas station, where they took the couple’s stuff to make the still sleeping Hollywood think the couple had left.[22] At this point, M.T. estimated that daybreak was not far off, as she could hear more traffic on the highway. After forcing her into the station’s bathroom, defendant shined the flashlight in her eyes and ordered her to take off her clothes. When she refused “because [she didn’t] know what [they] did to Matt,” defendant threatened her again and then told Nelson, *10 ‘You’ve got two minutes.” Although Nelson whined for more time, defendant ordered him to “hurry up.” Nelson then told M.T., “you better just take off your clothes; it would be better,” and so, she took off her clothes and Nelson raped her again, vaginally. Afterwards, everyone drifted off to sleep, with defendant blocking the doorway with his body and his machete.
Later that morning, M.T. was awakened by the whimpers of her puppy. She asked the men if she could take her dog outside to relieve itself, but defendant |inordered Nelson to take the dog outside. While outside, Nelson encountered Hollywood, who was awake and looking for his Mends, Matt and M.T. Hollywood got suspicious because Nelson had M.T.’s dog and the couple had left their radio. M.T. then heard Hollywood tell Nelson he would watch the dog for them. Defendant also heard the conversation between Nelson and Hollywood, prompting him to take measures to secure their hostage. From a pile of old clothing debris inside the bathroom, defendant took a sock and used it to gag M.T. Defendant then shredded some of the clothes with his machete and tied strips of cloth around her mouth and bound her hands behind her back and her legs together. While biting the gag with “the front of [her] teeth so it didn’t go all the way in [her] mouth,” M.T. pretended she was unable to talk or scream if prompted. When Nelson came back into the bathroom and reported that Hollywood thought something was strange, defendant exited the bathroom, leaving M.T. alone with Danil, who was fast asleep. Eventually, M.T. was able to loosen the ties enough to free one of her hands and pulled the gag from her mouth. She quickly pulled a shirt on, but her legs were still tied. Still naked from the waist down, she hopped passed a sleeping Danil to the door, pushed it open, and screamed Hollywood’s name.
Although defendant tried to push her back into the room, telling her to “shut the f— up,” it was already too late because at that moment Hollywood ran into the station and saw M.T. with her overalls down to her ankles and bindings around her arms and legs. Screaming at defendant and Nelson to “get the f— out of my way, get the f— out of here,” Hollywood shoved defendant aside and grabbed M.T., blocking her from their view. As Hollywood came to hug her, M.T. saw defendant reach into his pants “where he had kept that big knife before” and immediately warned Hollywood. Undaunted, Hollywood continued his screams to “get the f — - |i;out of here,” blocking M.T. with his body, all the while turning sideways to keep the men in his sights.[23] Heeding his warning, defendant and Nelson left the station, but then popped their heads back in, feigning unawareness of the situation and asking “What happened to her? Is she okay?”
In the safety of Hollywood’s arms, M.T. pulled up her pants, unbound her legs, and together they fled the Texaco bathroom, stopping only to grab her puppy. Once outside, she told him about the nightlong ordeal and that “Matt’s back in those bushes, I’ve got to And him, he’s tied up to a tree.” Together, they went to Love’s truck stop and called Matt’s brother,[24] Daniel Millican, who lived in the Baton Rouge metropolitan area, to help in the search. While M.T. placed the call, Holly *11 wood ran into the woods armed with a Threadall pipe in pursuit of the trio. Even with Daniel’s help, however, they had no luck finding Matt,[25] and so they went to the Shell station and called the police.
After taking M.T.’s statement about the kidnapping, robbery, and rapes, the police took M.T. to Earl K. Long Hospital for a rape examination. Vaginal swabs taken from M.T. subsequently tested positive for semen matching the DNA profile of James Nelson, II.
Shortly thereafter, the police found Matt’s body, bound from his neck to his wrists, which were still tied behind his back, face down in the Intracoastal Canal. Autopsy revealed Matt sustained a fatal stab wound to his right chest, which penetrated at least eight inches into his thoracic cavity, perforating his right lung and the right side of his heart. Evidence at trial revealed the blade of defendant’s 112K-bar knife “matched” the lethal stab wound and could not be ruled out as the murder weapon. Matt also sustained a “superficial,” non-lethal, one-third of an inch stab wound to his left neck, which was described as “commercial” intimidation, and multiple blunt force trauma to his head and face, particularly his left eye and lip, resulting in hematomas and even hemorrhaging in the lower lip and under the scalp. According to trial testimony, the trauma to his face was consistent with a right hook or blunt instrument, whereas the trauma to his head was consistent with a beer bottle as well as a blunt instrument even heavier than a beer bottle, like a log. Deep ligature marks in his wrists as well as a “pretty deep” ligature mark around his neck measuring “fourteen and a half inches and approximately three millimeters in width and one millimeter in depth” were also documented in the report. From all indications, Matt “got whipped pretty good” and was probably dead, but definitely unconscious from the blood loss caused by the puncture to the right side of his heart when he hit the water. His death was ruled a homicide, with exsangui-nation listed as the official cause.
Shortly after the discovery of Matt’s corpse, multiple law enforcement agencies commenced a manhunt for the three men.[26] Nelson was apprehended later that same day (February 8, 2006). However, the Garcia brothers eluded capture for three more days, until a clerk from the Shell station called the sheriffs office reporting she had attended to one of the brothers, who had injured his head from a fall in the parking lot. The West Baton Rouge Sheriffs Office Special Response Team was then deployed, using dogs from Hunt Correctional Facility. 11sDefendant and Danil had fashioned a palmetto encampment in the woods, and it was there at daybreak that law enforcement arrested them and seized knives, machetes,[27] and duffel bags belonging to the men.
*12 Nelson cooperated from the outset, and his statements of the events matched what M.T. told the police. However, unlike M.T., Nelson was able to fill in the blanks about what happened when he and defendant marched Matt to the water’s edge, which M.T. could not know because shehad been left behind, guarded by Danil and his machete. After being advised of their Miranda[28] rights, both defendant and Danil also gave recorded statements to the authorities. Danil’s story matched for the most part what M.T. and Nelson had told police.[29] Defendant’s custodial statements, after first denying any involvement or knowledge of the crimes, also matched the others, with the exception defendant initially named Nelson as the murderer, but then claimed the killing was accidental. Defendant’s statement was summarized in the Detective’s Narrative:[30]
He began by saying he didn’t know what we wanted. He then said he was there but didn’t have sex or kill anybody. When confronted with the statements made by the other two men, he confessed to having a knife, robbing the couple, taking them into the woods, raping the woman, beating the man. Michael said the victim was hog tied and brought to the water just to scare him. Michael said he was standing [14to the side and behind the man with the knife in his right hand. He stated that the two fell down a drop off to the water and he didn’t mean to stab the man in the chest. He said they left him in the water face down because they were scared. Michael stated that he and the white boy then rejoined his brother and the girl. He said they took her into the abandoned building and raped her for several hours. Michael stated that he did the armed robbery; he did the kidnapping; he did the aggravated rape; he stated he beat the man and tied him up but the killing was an accident.
Initially, all three men were charged with first-degree murder. On February 17, 2006, the District Court appointed counsel from the Eighteenth Judicial District’s Indigent Defender Board[31] to represent all three men.
When appointing counsel from the Indigent Defender Board, the District Court observed a problem with the same office representing three capital defendants:
THE COURT:
*13 We set this matter for preliminary examination this morning. Of course, all three of them are charged with first degree murder and other charges. As everyone knows, first degree murder does carry possible death penalty, depending on what the jury decides.
I appointed the Indigent Defender’s office to represent these three individuals. But we have to have two Indigent Defender Board certified public defenders to represent each one of them, which means we need six. We have eight in the district. All eight are not certified by the Indigent Defender Board. So that being the case, we have to continue this matter until Tuesday to give some opportunity to look into this matter and see who can represent who and try to get the logistics of that worked out.
The District Court then tasked Mr. Jerome “Jerry” D’Aquila, chief[32] of the Indigent Defender Board, with solving the problem:
JigTHE COURT:
What I’m going to do today, though, to make sure that we’ve got at least this much covered: I’m going to appoint Jerry D’Aquila as an Indigent Defender to represent Michael Garcia. He will be the lead counsel in that case, State versus Michael Garcia. I’m going to appoint Tommy Thompson as second chair to represent Mr. Garcia, because he has been certified as second chair on first degree murder cases, so he will be second chair on Michael Garcia.
I will appoint, again, the Indigent Defender’s office for the other two individuals and, Jerry, /all are going to figure out who is going to represent who, y’all are going to get this worked out for Tuesday?
MR. D’AQUILA:
We’ll take care of that internally in the office, Judge.
The District Court held a preliminary hearing on February 21, 2006, and by this time, the case assignments among the attorneys of the Indigent Defender Board had been made. D’Aquila informed the court he, Tommy Thompson, and Thomas Nelson would represent defendant;[33] Kevin Kimball and Yolanda Batiste would represent co-defendant James Nelson;[34] and Michael Parks and Lagretta Fortune La-zard would represent co-defendant Danil Garcia. After all counsel made their formal appearances, the District Court indicated there was another decision for the attorneys of the Indigent Defender Board to make:
THE COURT:
Before we get started, let me — I need to make this statement: yesterday, I received a phone call at my house from
*14 Nelvil Hollingsworth, do you know Nel-vil—
MR. THOMPSON:
I spoke with him today, Your Honor. THE COURT:
He let me know that — he said, “I have a death qualified team that is ready to defend, if /all need us.” I just want to throw that out to 11fiy’all. I don’t know what the logistics are behind getting that together, as far as whether you need him or not....
The topic quickly turned to the financial considerations of appointing another attorney qualified to defend a capital murder charge:
MR. THOMPSON:
I can tell you what they are. If you call him right now, he will be here if you’ve got about forty grand, Judge.
[[Image here]]
MR. D’AQUILA:
We don’t have those funds in our district.
The District Court then commented on the issue of financial cost:
Let me say this: of course, you know, trying a first degree murder case is not cheap. Any time you talk about trying a person for their life, money cannot be the overriding factor in determining what to do.
However, after declaring cost should not preclude independent representation, the District Court did not alter its previous pronouncement attorneys of the Indigent Defender Board would have to decide whether outside counsel was needed.
The hearing resumed to preserve M.T.’s testimony, and at the conclusion of the hearing, the district judge found probable cause to hold all three men on charges of first-degree murder, aggravated rape, armed robbery, and second-degree kidnapping.[35] Afterwards, the three defendants’ cases were severed.[36]
|17On March 3, 2006, the State gave notice of its intent to seek the death penalty and designated the aggravating circumstances upon which it would rely: “(1) The offender was engaged in the perpetration or attempted perpetration of aggravated kidnapping and armed robbery; (2) The offense was committed in an especially heinous, atrocious, or cruel manner.” Thereafter, the State and defense filed reciprocal discovery motions. On March 17, 2006, the defense filed its “Jackson[37] Demand for Notice of Any Bad Acts that the State May Wish to Use at Either Phase,” and in response, the State filed its initial answer putting the defense on notice of its intent to “introduce evidence of a murder that *15 Michael Garcia was involved in that happened near Tampa, Florida on or about the month of January, 2006. The facts in this murder are similar in nature to the facts in the instant case.” In compliance with the defense’s motion for “Bill of Particulars to State’s Notice of Intent to Use Other Crimes and Acts,” the State further expounded upon its intent “to use evidence of the following other crimes, wrongs and acts committed by Michael Garcia, to wit:
a. Act(s) of violence and murder of Bessie Davis ...
b. Act(s) of violence committed against Shyla Keys with a knife/machete ...
c. Act(s) of violence committed against [L.W.]....
d. Act(s) of violence committed against [M.T.]_”[38]
On November 8, 2007, the State again amended its notice to include the use of evidence of “Act(s) of violence committed against Daniel Corley in Gibsonton, Florida on or about November-December 2005, whereupon Michael Garcia | ^threatened Daniel Corley with a machete.” That same day, the District Court held its Pri-eur[39] hearing.
During the hearing, the State presented its other crimes evidence through the testimony of Detective James Richard “Richie” Johnson of the West Baton Rouge Sheriffs Office,[40] who at the request of the District Attorney’s Office conducted an investigation into any incidents in defendant’s past in which he committed “any crimes or any wrongful act or any wrongful conduct that was similar in nature to the charge [of] ... killing Matt....” Testifying from a spreadsheet he prepared, Det. Johnson explained in detail the various crimes defendant allegedly committed beginning some seven months before the murder at issue and involving the use of a machete in assaults, batteries, and robberies as well as in the rape of three women.
According to Det. Johnson’s testimony, defendant sexually assaulted his estranged girlfriend, L.W., in a wooded area in Lansing, Michigan, sometime in June 2005, by holding a machete to her throat and forcing her to perform oral sex. Three months later in Gibsonton, Florida, defendant cut the forehead of his girlfriend, Shyla Keys, with a machete during a fight. That same month defendant threatened Daniel Corley with a machete when Daniel, witnessing a fight between the couple, tried to intervene on Shyla’s behalf. Then, in January 2006, defendant participated in, if not instigated, the robbery, homicide, and sexual assault of 58-year-old Bessie Davies, who was killed, according to Det. Johnson, with a machete, “along with the blunt force trauma” likely inflicted by a dumbbell found at the scene. Through his testimony it was further revealed that pri- or to her murder, Davies was bound with masking tape and anally raped with a vibrator.
11sAfter the conclusion of the detective’s recitation of defendant’s criminal activity in the seven-month period preceding Matt’s murder, which included the events *16 leading up to his murder,[41] the State averred the common thread was Michael Garcia and a machete, notwithstanding the murder weapon used to kill Matt was a knife. Along this line of reasoning, the State argued the other crimes evidence was admissible for the purposes of showing “the pattern, the plan, his system, his motive, and how he operates”:
[T]his is the purposes of which we are bringing them. Such as proof of motive, the motive being that if he didn’t get what he wanted, he would use his machete and inflict his force or show his force toward all of his victims to make them comply.
The other one is opportunity. Here it shows that in every place that this crime took place that Mr. Garcia was present and that he had the motive as well as the opportunity to commit these acts. Because he only acted either by himself or with his little cadre of friends....
Intent. It shows intent, Judge, in that each and every one of these folks he inflicted some type of violence upon them. Be it threats or be it the actual carrying out of his violence when he did not get what he wanted.
The other one is preparation. Judge, preparation, I don’t know if that necessarily fits, but plan does.
Plan. It definitely shows that his plan is that he’s — he takes these folks and it doesn’t matter if he’s with Nelson and Daniel [sic] his brother, but his plan is that he went, he robbed, and he made sure that he kills the people that he robs so he won’t leave any wintnesses [sic] behind.
He also sexually assaults. You saw where they assaulted Ms. Bessie Davies in Florida, and then they ultimately killed her. Now, I know they asked Mr. Johnson whether or not she was kidnapped, but the fact that in his early testimony he said that she was taken from one place in her house to the other and placed on the couch. That’s definitely kidnapping to me, when you prove [sic] a person from one part — that same thing applies here to Ms. [M.T.]. She was taken from the abandoned gas station and walked out to the woods, I think, | ansexually assaulted and then brought back to that gas station again, by use of a threat, force, and having that machete.
Another part is the knowledge — I don’t know if that applies, but identity does, Judge. These folks picked him out. All these other folks came up and said it was Daniel Garcia [sic], the ones that survived. He made the point was Shyla Keys murdered? No. But, she lived and she testified that he had the machete. Did Daniel Corley — was he murdered? No. But, he testified or he will testify that he was the person that held the machete to him. The same thing with [L.W.], the same thing with [M.T.]. The only two that won’t live to tell us today will be the two that he killed, and that would be Ms. Bessie *17 Davies and Mr. Matthew Millican.... [42]
* ⅜ *
We definitely got him, Judge, and we ask to show that give us this to show the pattern, the plan, his system, his motive, and how he operates. That’s just his— he had this chain of bad behavior from the time he left Michigan, he was on a death mission that swept throughout the eastern corridor of this country. And, those were the cases that we were able to put together and give direct links back to this man. And, we’ll ask that a jury — and because of just what you asked, how are you going to be able to prove that, that the jury gets to his pattern.
[[Image here]]
I understand we’ve got to bring these folks here to testify, and we’re planning on bringing them.[43]
*18 |P1In response, the defense argued:[44]
Judge, I think [the prosecutor] and I think the Court hit it on the head, 404(B) expressly says that you can’t use other acts to show that someone is a bad guy and so he must have done this act.
[[Image here]]
The proof of motive in this case — I know what any of those other cases have to do with proving his motive in this case. The opportunity to commit this crime, I don’t know what any of those other cases have to do with showing he had an opportunity to commit this crime. None of those cases proved or had anything to do with proof that he was in the area or anything of that nature. His intent to commit the crime in West Baton Rouge Parish, none of those cases, in my opinion, show — especially the cases like with Mr. Daniel Corley where he was threatened allegedly with a knife. That’s it.
[[Image here]]
Preparation, I don’t think it has anything to do with the preparation. I don’t think it has anything to do with the plan.
[[Image here]]
Identity in this case — none of those cases have anything to do it [sic] to Mr. Garcia’s identity in this case, Judge, not one of them. So, I think that none of these cases should be allowed in.
^Nevertheless, the judge found the other crimes evidence admissible under State v. Prieur, 277 So.2d 126 (La.1973), reasoning:
It’s at a minimum to show his identity that the same person that did these things to these other people is the same person who killed this man here through the same — I would say you could probably get it under plan, but in the same way. I think it helps to show identity at least, at a minimum. All you need is one....
* * *
That’s all you’ve got to do, you just need one.
After defense counsel’s objection was noted for the record, the State added: “We want this done in our guilt phase. So, we want him to understand that this will be done in the guilt phase.”[45] The hearing concluded without counsel notifying the court of his intent to seek writs on the adverse ruling, and indeed, for whatever reason, defense counsel did not seek appellate review of the District Court’s ruling.[46] Rather, this matter proceeded to trial.
*19 During its opening statement, the State laid out its trial strategy to use other crimes evidence to illustrate what it referred to as defendant’s reign of terror, which began in Lansing, Michigan, and ended in Port Allen, Louisiana:[47]
I23I am about to ... take you on a roadmap where Michael Garcia inflicted his terror, not only on Louisiana, but parts of America. You see, he is from Michigan. The story is going to start off up there, and I’m going to take you back to mid-'05 and tell you what happened up there, and then they are going to go straight down here, I think they make a stop in Tennessee, come on down to Florida. And we’re going to talk about it and I’m going to tell you what the evidence is going to show he did in Florida. And as they were leaving out of Florida, they were headed to Arizona, but they stopped off in Slidell and then they ended in Baton Rouge, Louisiana, and you are going to hear about Baton Rouge, Louisiana, which will be the underlying charge of what this entire case is about.
Let’s start this little trek. That is Michael (indicating picture). Those eyes, Folks, the evidence is going to show that that is Michael Garcia that was in Baton Rouge, or Louisiana, Port Allen, at the time we caught him. That’s him, my man. We are going to talk about him from north to south, from Michigan to Louisiana, we’re going to talk about those guys.
Michael Myers was in a movie called “Halloween.” Chuckie, you know who Chuckie was, he was in a movie called Chuckie. Jason was in this movie, Friday the Thirteenth. And Grandfather,[48] you’re going to hear about ole Grandfather. You see, those names there are the names of his weapons of mass destruction, those are his knives, Folks. And wait till you see his knives, you talk about knives, machetes, samurais, and Rambo-style knives, of which he went through, cut through the fabric of this country, he cut through the fabric and the meat of human beings like a butcher cuts through bologna.
However, the State also made clear the jury was only there to judge the case “about Matt and [M.T.].”
The State, in its case-in-chief, introduced a litany of the other crimes evidence, which constitutes the first 150 pages of the guilt phase transcript, tracing defendant’s crime spree that began in the summer of 2005, in Michigan, passed through Florida with violent murderous effects, and culminated in Port Allen, Louisiana, with the February 8, 2006 murder of Matt. Appropriately, before each |?4of the State’s five *20 Prieur witnesses took the stand, the judge read the following limiting instruction:
Before this testimony, I must read you this instruction again regarding proof of other crimes. (Reading) Evidence that the defendant was involved in the commission of other crimes or offenses other than the offense for which he is on trial is to be considered only for a limited purpose. Such evidence can be admitted to show guilty knowledge, absence of mistake or accident, intent, system, motive or identity. For sex offenses, such evidence may be considered for its bearing on any matter to which it is relevant. Remember, the accused is on trial only for the offense charged. You may not find him guilty of this offense merely because he may have committed another offense.
Commencing its “roadmap of terror,” the State first called to the stand L.W., who testified about her romantic relationship with defendant that began in Lansing, Michigan, “sometime in 2002 ... a couple months after he got out of prison.”[49] Initially, the couple had one son together. L.W. estimated she and defendant had been apart for eight months to a year by March 2005, when defendant broke into her apartment and raped her, saying, “you either give me what I want or I beat your ass.” She did not resist because she was afraid, and as a result of that rape, she conceived a second child by defendant.
L.W. also related an incident from June 2005 in which defendant’s sister picked her up, ostensibly to take her home, but instead followed defendant into the woods where he “got [her] out of the car and shoved [her] in his.” He then dragged her out of the car and forced her onto her knees, telling her “we were going to be together whether [she] liked it or not.” At that point, defendant grabbed his machete, placed it to her neck, and told her: “you suck my d— or I’ll slit your throat.” She complied with his command, “I told him I love him and I’d be with him forever ... [b]ecause I didn’t want him to slit my throat.” After that, defendant LJet her go. At trial, L.W. identified for the jury the machete with which defendant assaulted her and the samurai sword defendant had in his possession in Michigan.
Next, the State introduced a copy of a June 30, 2005 petition for protective order, which L.W. had sought through the Michigan judicial system. Attached to the petition were three handwritten affidavits detailing defendant’s March 2005 break-in of her apartment, as well as other instances of his stalking and threatening her with a machete. On July 1, 2005, a Michigan judge issued an ex parte order prohibiting defendant from L.W.’s property. The order also barred defendant from “assaulting, attacking, beating, molesting, or wounding [L.W.],” and forbade defendant from “stalking” her or “threatening to kill or physically injure [L.W.].” These documents were then published to the jury.
On cross-examination, L.W. acknowledged she has two sons by defendant: one born May 18, 2004, and the second born December 28, 2005. When defense counsel asked L.W. to detail again what defendant did to her in the woods, she replied: “[h]e drug me by my arm and proceeded to drag me by my hair, put me on my knees, made me suck his d — , said I wasn’t coming out of those woods unless I was in a body bag.” Counsel also introduced some handwritten letters and poems *21 L.W. wrote to defendant while he was in jail awaiting trial on these charges, and on each, she signed the letters, “Love, [L.W.] and the boys.” The witness explained why she had written such a sentiment: “I figured if he ever got out, I’d rather be on good terms.”
On re-direct, the prosecutor read aloud from a handwritten affidavit attached to a petition for protective order, which L.W. sought against defendant on September 7, 2004:
Q. Just for the sake of my questioning — all right, I’ll read it exactly. See midway down where it says, “then he really got upset, pushed me onto the bed, started punching me on my right leg around |2fithe knee and up farther, then he started kicking me in the same area. He stopped because I told him our [three] month old was crying. There was a time before around the end of July when we had an agreement [sic] over something and I told him it was over, I was leaving, and when I got in my van, he began to get disturbed and started pushing me and slapping me around. So before it got any worse, I made up with him because again our three month old son was getting scared. So for the baby, I made him stop by staying. He is only physical when he drinks but he is controlling and emotionally and mentally abusive. He calls me names. He tells me what I can wear, who I can hang out with. He checks my phone, incoming and out going. He checks my mail. He calls me throughout the day to make sure I was home. He unhooks my battery and has broken things on my van so I was stuck at home. A few time in the past, the three month old was crying and he told me to spank him so he would stop. You don’t spank a baby or child. I ask that you please help me and our three month old baby to be safe from him.”[50]
Returning to the subject of her letters, L.W. further explained she corresponded with defendant largely for the sake of her sons, “I just thought the letters would be nice and pictures, maybe he would want to see his kids grow up even if he didn’t make it out of here.”[51] However, she never relaxed her guard or her fear of defendant: “If he gets out, who knows if I’m going to live or die.”[52]
Continuing along its roadmap, the State next called Daniel Corley, who testified that, in November 2005, he was in Gibson-ton, Florida, and knew defendant and his then-girlfriend, Shyla Keys. Corley recalled one particular night when they were “sitting around drinking” and he intervened in an argument between defendant and Shyla. At that point, defendant “had a machete in his hand, he swiped the bushes, pointed the machete at me, and said that he would kill me with it.” Corley indicated he never saw or spoke with defendant again after that [27incident. The witness identified the machete defendant used to threaten him; he also identified the K-Bar knife used to kill Matt as a weapon he “saw Michael with.”
Shyla Keys then took the stand, first explaining how she met defendant in Lan *22 sing, Michigan, and began a romantic relationship with him in September 2005, and how a few weeks later, she, defendant, and his brother Danil, left Michigan by bus and traveled to Tampa, Florida. There, the three of them stayed at a bunkhouse frequented by carnival people and were befriended by “a lady by the name of Bessie Davies.” Shyla then gave her account of defendant’s theft and arson of Davies’s car as well as his involvement in her murder.
One night, Shyla was angry after defendant had been gone for a while, and she took off walking down the railroad tracks nearby. She got scared, and using her cell phone, she called defendant, who, along with Danil and Nelson, came and picked her up in Davies’s car. Shyla remembered asking defendant, “how did you get her car?” Defendant claimed Davies had let him borrow it. She also recalled that, after she got in, defendant began driving “crazy ... erratically ... [r]ewing it, running it, nuts.” After they broke the transmission and pushed the car off to the side, Shyla “knew that they were going to catch it on fire,” and so, she started walking away. When she looked back, “it was on fire.”
The following morning, as she watched the news, Shyla learned for the first time Davies had been murdered and confronted defendant, asking him: “Did you kill that lady?” Defendant “[njodded his head and walked away.” After that, defendant told Shyla he had to “[g]et out of there.... Out of state.” Then, when he told her they were going to head to Texas, Shyla told him she was not going with him “because I knew it would be the same [as] when we came down to Florida.”
lasNext, Shyla told the jurors defendant had names for his various machetes and knives, most of which corresponded to characters in the “scary movie Halloween,” for example, Godfather, Myers, Chuckie, and Jason. She further recalled her own encounter with the machete called “Jason,” explaining, one night she and defendant started arguing,
[a]nd he got angry, got over the top of me, yelled to James, go get Jason. He went and got it. He was on top of me, had the machete holding over my head. I was holding onto his arms. We were wrestling. He was pushing and I was trying to pull back. My arm slipped off his and bam, right in the head.
Shyla testified “blood went everywhere on the floor,” and she got herself to the bathroom, cleaned the wound, and fashioned a band-aid into “butterfly stitches.” To the jury, she pointed out the one-inch scar on her forehead, above her left eye, where the machete cut her. When Shyla returned from the bathroom, she recalled noticing a “square of carpet was cut out where all the blood was and they were burning it in the grill.”
On cross-examination, Shyla admitted, after defendant cut her with the machete, she continued to reside and sleep with him for approximately one week, because she “had to.” She also confirmed she has kept in touch with defendant: “I talked to him maybe twice while he was — first went to jail here.”[53] Shyla even acknowledged sending him a Valentine’s Day card.
*23 [29Next, the State called Detective Dale Bunten, a homicide detective from Hills-borough County, Florida, to testify about the rape and murder of Bessie Davies, whose decomposed body was discovered in her home in Gibsonton on January 13, 2006.[54] The detective explained Davies was found lying on her back on the living room floor, with tape bound around her eyes, mouth, and hands, and had sustained blunt impact to her head, possibly inflicted by the silver dumbbell weight found near her body. A pool of blood was also visible underneath her body from a stab wound that penetrated the left side of her neck. Det. Bunten stated Davies was in an advanced state of decomposition, her skin was slipping and “blistering to the point where it appeared that some of the tape was starting to roll off from around the mouth because of how much she was distended.” Through his testimony, the State introduced a photo of her body as found at the scene days after her murder.
Further according to the detective’s testimony, sometime after the crime scene was secured Davies’s vehicle, which had been parked at the house, was stolen and later found burned on the railroad tracks about a mile and a half away. At that point, the case was suddenly all over the media. Leads came in, but the case began to go cold until February 9, 2006, when Det. Bunten was contacted by the FBI about the similarities between the Florida murder he was investigating and a case in Port Allen, Louisiana.
On February 11, 2006, Det. Bunten flew to Baton Rouge and met with Det. Johnson. Upon arrival, he was given access to the bags and belongings of the three arrested suspects, and among their seized possessions was a large amount of jewelry that appeared to have been taken from Davies’s home, as the detective |anrecalled seeing drawers and jewelry boxes strewn open at that crime scene. Det. Bunten was also allowed to interview defendant, Danil Garcia, and James Nelson about the Florida murder. After separately interviewing the three suspects, he came to “believe it was Michael Garcia,” who murdered Bessie Davies, a fact about which he was “a hundred percent” sure, even though defendant repeatedly “denied having any involvement or knowledge with the case.” Later, however, defendant admitted to the detective that he and his brother had been present when “James killed the bitch”:
He went on to say that James went to the door of the house, knocked on the door. When Bessie Davies opened the door, he forced his way into the house, he went inside — James went inside, was in there a while, Michael and Danil stood at the doorway of the exterior door of the home.... They stood there while James had the victim in the back of the house, brought her out to the living room area, put her on the couch, struck her on the head several times with a silver dumbbell wrapped in a cloth, then took a machete to her throat.
He further recalled asking defendant specifically if he had touched the victim, who had also been raped, and although defendant denied touching her, scrapings from Davies’s right fingernails yielded a positive DNA match to Michael Garcia.
The State then called James Nelson who began his testimony by explaining how he met defendant in Gibsonton, Florida, and *24 how together with Shyla and Danil, the foursome resided at Tommy Fields’s trailer. He explained it was Fields who introduced them to Davies, a nice lady who lived nearby, and whose home they had visited on at least one previous occasion to repair her motor home. Nelson then recalled the day of her murder, testifying:
We went there to rob her and Michael Garcia was looking for a gun that she said that she had. We end up taping her hands behind her back and taping her mouth shut.... Me and Michael went searching through the house. We didn’t come up with anything. We went back in there and Michael Garcia’s brother, Danil Garcia, end up taking a dildo and putting it in her .... [s]hoved it in her vagina.... Also in her anal.... I end up jacking off on her.... I was drunk. I was seeing what was going on. I got excited and I just jacked off.... She screamed.... |31with that tape on her mouth. It was like a scream being blocked by-like if a mouth is muffled .... We took her into the living room. We was searching through the living room for jewelry and stuff, anything valuable. After that, Michael Garcia end up hitting her in her head with the dumbbell that was in a towel.... She end up sliding off the couch onto the floor.... He end up sticking the machete in through her throat.[55]
Nelson further identified the machete defendant used to stab Davies as the one defendant called “Jason.” He also admitted he was likewise armed with a machete, as well as a small knife at the time of the Florida murder and further recalled that, after the murder, the three of them went back to where they were staying and “just sat there and chilled and got drunk.”
A couple of days after the murder, the trio returned and broke into Davies’s home and motor home to see if there was anything valuable they could steal; they were still looking for Davies’s gun. He admitted all three of them took jewelry and further testified how he “hot wired” Davies’s car and drove it from the scene. IsaAfter they picked up Shyla, defendant, who at that point was driving, drove the car onto the railroad tracks. When the car overheated and began smoking, they pulled the vehicle into a path where he and defendant set the car on fire. Afterwards, an acquaintance of Nelson told him of seeing a newscast concerning Davies’s car. *25 When he conveyed this information to defendant, the trio decided it was time to leave Florida.
Nelson then explained to the jury how the threesome came to depart from Florida by stealing Fields’s truck and heading west. He told the jury how they drove as far as Slidell where the truck broke down. Stranded, they stayed in the woods behind the Waffle House for about two weeks, before they got “a job working for this dude that did drywall. We stayed with him for another week. And then we end up taking the RV.[56] and we drove it down and the motor end up blowing up over in Ramah.” Nelson admitted they took the man’s motor home without his permission and further recalled, when the RV broke down, they “end[ed] up sleeping under the overpass” one night. The following morning, they caught a ride back to Port Allen. When they first got to Port Allen, they met Hollywood, who invited them to sleep in an abandoned gas station with him and his friends, M.T. and Matt.
From this point on, the focus of the testimony and the State’s case was on the circumstances surrounding Matt’s murder and M.T.’s sexual assault as presented to the jury through the testimony of Nelson, Det. Johnson, Hollywood, and finally M.T., who recounted the harrowing events of that night and her last moments with Matt.[57] Through the remainder of this testimony and evidence the Instate sought to establish defendant intentionally killed Matt with his K-bar knife during the perpetration of an armed robbery and aggravated kidnapping.
Significantly, during Det. Johnson’s testimony, the State introduced defendant’s custodial statements, and when the tapes were played, the jury heard defendant’s version of the events and how Matt accidentally fell on his K-bar knife. To rebut his claim of accidental homicide, the State relied upon the testimony of the only other living witness to the murder, Nelson, and the testimony of its expert forensic pathologist, Dr. Alfredo Suarez.
During his direct testimony, Nelson provided a narrative of the murder. He described how he and defendant escorted Matt away from the others and led him deeper into the woods until they reached the water’s edge, even though they were apparently unaware a body of water was there until they literally fell on it. “Michael and Matthew end up walking off the side of the bank. I end up stepping into a hole.” However, according to Nelson, at the moment when defendant and Matt slid down the embankment, Matt was still alive, and after that, he was still standing. Joining the two on the water’s edge, Nelson saw defendant stab Matt “in the chest” from behind. When the prosecutor asked, “was it an accident?” Nelson replied: “At first I thought it was, but then I came to realize that it wasn’t.” On re-direct, he explained to the prosecutor: “I didn’t know [defendant] had the knife and stabbed the dude until after he pulled it out and I seen it in his hand.”
During the testimony of the State’s forensic pathologist, Dr. Suarez, the prosecutor asked the expert’s opinion regarding whether Matt’s death could have been an accident, and Dr. Suarez emphatically opined Matt could not have fallen on the knife. For that to have been plausible, he explained, the knife would have had to have been fixed in cement; otherwise, the *26 knife would have gone “every which way,” “not straight in there” to a depth of at least eight inches, penetrating |o4Matt’s thoracic cavity through his second and third rib, perforating his right lung, and puncturing his heart:
Q. Listen, there was some testimony that the dead man, Mr. Matthew could have fallen down and fell into [the knife], and then as Mr. Michael Garcia, the evidence shows that he said the knife went away and it accidentally stabbed him. Could that have happened that way?
A. Not at all. This knife was driven by force in there. There was a lot of force behind it. It wasn’t just the fall into the knife. It was driven by force behind the handle.
Q. He maybe he said he fell backwards on to it and it accidentally stabbed him. Could that have happened that way? A. No, no, it didn’t happen.
Q. I mean, was this guy — this death an accident in your opinion, or was it a homicide?
A. Well, all the evidence points to a homicide.
Thereafter, defense counsel further explored the notion of accident with the forensic pathologist:
Q. And, you were asked that — could Mr. Millican have fallen on this knife— let me show you — could Mr. Millican have fallen on this knife and it penetrated, and you said, no, right?
A. Well, no, it can’t be.
Q. There’s no way I can fall on this knife and the weight of my body falling from 5'7"—
A. Who was holding the knife?
Q. My question is, would the weight of my body force this knife to go into me as far as you say it went? Could it have? A. No.
Q. Not possible?
A. No. You see, the weight couldn’t have gone that far, eight inches into the body, with that scenario.
Q. Why is that?
A. The only way that could have happened is the knife is fixed in cement and then the body falls on it.
The thrust of the defense’s case, on the other hand, sought to temporally disassociate the armed robbery from the murder, while at the same time proposing an alternative defense to accidental homicide: Nelson actually did the killing.[58] In lafiSupport of its alternative theory, the defense introduced expert testimony, which revealed only Nelson’s DNA was consistent with that present in M.T.’s rape kit, and the testimony of its forensic pathologist, Dr. Emile Laga, who opined the fatal stab wound was most likely caused by the *27 taller, bigger, left-handed man on Matt’s left-side, i.e., Nelson:
Q. And, your opinion based on my hy-pothet of the man on the right, short, right-handed [defendant], or standing behind a taller man [Matt] as opposed to a man on the left, left-handed, taller than the man on the right, heavier than the man on the right [Nelson], which one of them is more likely in your opinion to have caused that stab wound? A. The one on the left side, taller, bigger—
In closing, defense counsel framed the principal issues of the guilt phase as (1) whether defendant or Nelson inflicted the fatal stab wound to Matt; and if the jury answered the first part with “defendant,” then (2) whether the stabbing of Matt was intentional or accidental.
Expressing its confidence the jury would find defendant stabbed Matt, the State in its closing explained how the jury could rely on the other crimes evidence to answer the remaining question of intent by considering his plan, his motives, and his mode of operating:
once you have determined that he did the underlying crime, which he did and killed [Matt], you can use other crimes evidence to consider his plan, whether or not he used certain motives, the way he operates, the way he operated in Florida, homeless people, people that helped him, stabbed them and then moving off the way he did Matthew, bound him, gagged him, stabbed him. That’s him folks.
Thereafter, the State took the jury through its roadmap one last time, and the District Court then re-instructed in the jury:
IsfiYou have heard evidence of acts of the defendant which may be similar to the one charged in the indictment, but which were committed on other occasions. You must not consider any of this evidence in deciding if the defendant committed the act charged in the indictment. However, you may consider the evidence for other very limited purposes. If you find beyond a reasonable doubt from other evidence in this case that the defendant did commit the act charged in the indictment, then you may consider evidence of the similar acts allegedly committed on other occasions to determine: Whether the defendant had the state of mind or intent necessary to commit the crime charged in the indictment; or whether the defendant had a motive or the opportunity to commit the acts charged in the indictment; or whether the defendant acted according to a plan or in preparation for the commission of a crime; or whether the defendant committed the acts for which he is on trial by accident or mistake.
Clearly not persuaded by the defense, the jury returned a unanimous guilty verdict after eleven minutes of deliberation and subsequently a recommendation of death.
ASSIGNMENTS OF ERROR
Out of defendant’s eighty-five assignments of error on direct appeal, we have identified nineteen separate arguments. In this published opinion, we will discuss only those arguments concerning alleged conflicts of interest in trial counsel, disclosure of James Nelson’s plea deal, and the admission of other crimes evidence, respectively.

Conflict of Interest

In an initial assignment of error, appellate counsel contends the simultaneous representation of three co-defendants by the chief and employees of the Eighteenth Judicial District Indigent Defender created an actual conflict of interest in this case in violation of defendant’s rights to coun *28 sel, a fair trial, and reliable sentencing proceeding. Importantly, defendant was tried separately from his two co-conspirators, and at no point before trial did the issue of conflict of interest arise. Moreover, defendant never sought to replace counsel.
1 S7Assistance of counsel in one’s defense and the appointment of counsel if indigent is guaranteed by the Sixth Amendment to the federal constitution[59] and by Article I, § 13 of the Louisiana Constitution.[60] When counsel is required, the constitutional mandate for a fair trial requires counsel be competent. See United States v. Cronic, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); Strickland v. Washington, 466 U.S. 668, 685-86, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The assistance of counsel is an essential right because it is the means by which a defendant asserts all other constitutional rights within our justice system. See Cronic, 466 U.S. at 653-54, 104 S.Ct. 2039. Therefore, when counsel has a conflict of interest, the conflict may thwart the assertion of a full defense to criminal charges.
Such conflicts usually arise in the context of joint representation. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). However, joint representation is not per se illegal and does not violate the Sixth Amendment of the United States Constitution or Article I, § 13 of the Louisiana Constitution unless it gives rise to an actual conflict of interest. State v. Ross, 410 So.2d 1388, 1390 (La.1982).
| ^Generally, under our jurisprudence, “Indigent Defender Boards are ... treated as the equivalent of private law firms to effectuate a defendant’s Sixth Amendment right to effective assistance of conflict-free counsel and the ethical obligation of an attorney associated with other lawyers in a firm to avoid representing a client ‘when any one of them practicing alone would be prohibited from doing so.... ’ La. Rules of Professional Responsibility, Rule 1.10(a).” State v. Connolly, 06-0540 (La.6/2/06), 930 So.2d 951, 954, n. 1; State v. McNeal, 594 So.2d 876 (La.1992). However, this case presents us with issues arising from indigent defense services provided during the restructuring of such services. See supra note 31. The crime occurred in February of 2006. Trial in this matter was held in May 2008. Effective August 15, 2007, the Legislature implemented statewide standards and guidelines for indigent defense through the Louisiana Public Defender Act of 2007. See 2007 La. Acts 307, § 1; State v. *29 Reeves, 06-2419, p. 13 n. 13 (La.5/5/09), 11 So.3d 1031, 1042, n. 13.
Former La.Rev.Stat. § 15:144(A) provided, in pertinent part: “An indigent defender board, hereinafter referred to as the district board, shall be established in each judicial district....” Each district board was authorized to select the manner of providing indigent defender services to the judicial district, either utilizing one or a combination of the following: (1) appointment of volunteer attorneys; (2) employment of a chief indigent defender and such assistants and supporting personnel as deemed necessary (staff counsel); and (3) contracting with one or more attorneys licensed to practice law in the state (contract counsel). See former La.Rev.Stat. § 15:145(B). Whichever model was used to provide indigent defender services in the judicial district prior to restructuring was carried over after the effective date of the 2007 legislation. See La.Rev.Stat. § 15:165(C).
1 .^Considering the various models authorized for delivery of indigent defender services to the judicial districts, a question arose in our analysis of defendant’s attorney conflict issue regarding what model was employed by the Eighteenth Judicial District for the relevant time period. Consequently, we remanded this matter to the District Court to determine whether the delivery of indigent defense in the Eighteenth Judicial District was performed by employees (staff counsel) or by attorneys separately contracted by the Indigent Defender Board (contract counsel). State v. Garcia, 09-1578 (La.9/23/11), 80 So.3d 1150 (Knoll, J., dissenting).
On remand, the District Court held several hearings between November 18, 2011, and January 20, 2012.[61] The defense called twenty-one witnesses and introduced over 100 exhibits. Additional testimony was admitted by stipulation.
In its well-considered oral reasons for judgment, the District Court analyzed the facts adduced on remand under several tests. In addition to the IRS Audit Manual factors for determining whether a person is an “employee” or an “independent contractor,” the District Court looked to this state’s definitions under worker’s compensation law and the U.S. Supreme Court case of Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). The District Court stated it reviewed as many sources as he could to cull the most complete set of factors to aid in his determination. After analyzing and weighing each factor, the District Court concluded the delivery of indigent defense in the Eighteenth Judicial District was through independent contractors. We find no abuse of the District Court’s discretion in the factual findings adduced from the hearings on remand, which we find are completely supported by the record. Likewise, we find no legal error in 14nthe District Court’s conclusion, based upon those facts, the attorneys in this matter were independent contractors.
Regardless, as there was no objection by defense counsel, see Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), and the trial record and the record on remand do not demonstrate an actual conflict of interest, i.e., a conflict that affected counsel’s performance, see Mickens v. Taylor, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002), Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the employ *30 ment status of the indigent defenders is immaterial.
The Supreme Court has held in regard to multiple representations and a defendant’s constitutional right to assistance of counsel:
The Sixth Amendment provides that a criminal defendant shall have the right to “the Assistance of Counsel for his defence.” This right has been accorded, we have said, “not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.” United States v. Cronic, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). It follows from this that assistance which is ineffective in preserving fairness does not meet the constitutional mandate, see Strickland v. Washington, 466 U.S. 668, 685-686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); and it also follows that defects in assistance that have no probable effect upon the trial’s outcome do not establish a constitutional violation. As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate “a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id., at 694,104 S.Ct. 2052.
There is an exception to this general rule. We have spared the defendant the need of showing probable effect upon the outcome, and have simply presumed such effect, where assistance of counsel has been denied entirely or during a critical stage of the proceeding. When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. See Cronic, supra, at 658-659, 104 S.Ct. 2039; see also Geders v. United States, 425 U.S. 80, 91, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); Gideon v. Wainwright, 372 U.S. 335, 344-345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). But only in “circumstances of that magnitude” do we forgo individual inquiry into whether counsel’s inadequate performance undermined the reliability of the verdict. Cronic, supra, at 659, n. 26, 104 S.Ct. 2039.
We have held in several cases that “circumstances of that magnitude” may also arise when the defendant’s attorney actively represented conflicting interests.
Mickens, 535 U.S. at 166, 122 S.Ct. at 1240-11. We turn now to a discussion of those seminal cases — Holloway, Sullivan, and Mickens.
Interestingly and tellingly, Holloway involved the situation in which defense counsel objected he could not adequately represent the divergent interests of three co-defendants, and without inquiry, the trial court denied counsel’s motions for the appointment of separate counsel and refused to allow counsel to cross-examine any of the defendants on behalf of the other two. Holloway, 435 U.S. at 478-480, 98 S.Ct. 1173. Notably, the Holloway Court deferred to the judgment of counsel regarding the existence of a disabling conflict, recognizing (1) a defense attorney is in the best position to determine when a conflict exists, (2) he has an ethical obligation to advise the court of any problem, and (3) his declarations to the court are “virtually made under oath.” Id., at 485-486, 98 S.Ct. 1173 (internal quotation marks omitted). Moreover, the Court presumed the conflict, “which [the defendant] and his counsel tried to avoid by timely objections to the joint representation,” undermined the adversarial process. Id., at 490, 98 S.Ct. 1173. This “presumption was justified because joint representation of conflicting interests is inherently suspect, and because counsel’s conflicting obligations to multiple defendants ‘effectively sea[l] his *31 lips on crucial matters’ and make it difficult to measure the precise harm arising from counsel’s errors.” Mickens, 535 U.S. at 168, 122 S.Ct. at 1241 (quoting Holloway, at 489-490, 98 S.Ct. 1173). Holloway “thus creates an automatic reversal rule only where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict,” specifically holding “ ‘whenever a trial court improperly requires joint representation over timely objection reversal is automatic.’” Id. at 168, 122 S.Ct. at 1241-42 (quoting Holloway, at 488, 98 S.Ct. 1173).
Sullivan, on the other hand, involved the representation by one attorney of three defendants accused of murder who were tried separately. Significantly, | ^neither counsel nor anyone else objected to the multiple representation, and counsel’s opening argument at Sullivan’s trial suggested the interests of the defendants were aligned. Sullivan, at 347-348, 100 S.Ct. 1708.
The Sullivan Court declined to extend Holloway’s automatic reversal rule to this situation and held, absent objection, a defendant must demonstrate “a conflict of interest actually affected the adequacy of his representation.” Id., at 348-349, 100 S.Ct. 1708. In addition to describing the defendant’s burden of proof, Sullivan addressed separately a trial court’s duty to inquire into the propriety of a multiple representation, construing Holloway to require inquiry only when “the trial court knows or reasonably should know that a particular conflict exists,” which is not to be confused with when the trial court is aware of a vague, unspecified possibility of conflict, such as that which “inheres in almost every instance of multiple representation.” Id., at 347-48, 98 S.Ct. 1173. In Sullivan, the Court concluded no “special circumstances” triggered the trial court’s duty to inquire. Id., at 346, 98 S.Ct. 1173.
Most recently, in Mickens, the Court addressed the issue of “what a defendant must show in order to demonstrate a Sixth Amendment violation where the trial court fails to inquire into a potential conflict of interest about which it knew or reasonably should have known.” Mickens, 535 U.S. at 164, 122 S.Ct. at 1239. The Mickens Court concluded, in order to demonstrate a Sixth Amendment violation where the trial court fails to inquire into a potential conflict of interest about which it knew or reasonably should have known, a defendant must establish a conflict of interest adversely affected his counsel’s performance. Id., at 164, 122 S.Ct. at 1240-1246.
To revolve the issue before it, the Mick-ens Court examined both Holloway and Sullivan, acknowledging both Sullivan and Holloway “stressed the high Improbability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice.” Id., at 175, 122 S.Ct. at 1245.
Notably, unlike the present case, Mick-ens involved the representation of a capital defendant by an attorney previously appointed to represent the victim. However, like the instant case, the same judge made both appointments, i.e., the judge knew or should have known of the potential conflict. In light of the judge’s failure to make the Sullivan-mandated inquiry, Mickens sought automatic reversal. The Court found, however,
Petitioner’s proposed rule of automatic reversal when there existed a conflict that did not affect counsel’s performance, but the trial judge failed to make the Sullivan-mandated inquiry, makes little policy sense. As discussed, the rule applied when the trial judge is not aware of the conflict (and thus not obligated to inquire) is that prejudice will be *32 presumed only if the conflict has significantly affected counsel’s performance— thereby rendering the verdict unreliable, .even though Strickland prejudice cannot be shown. See Sullivan, supra, at 348-349, 100 S.Ct. 1708. The trial court’s awareness of a potential conflict neither renders it more likely that counsel’s performance was significantly affected nor in any other way renders the verdict unreliable. Cf. United States v. Cronic, 466 U.S., at 662, n. 31, 104 S.Ct. 2039. Nor does the trial judge’s failure to make the Sullivan-mandated inquiry often make it harder for reviewing courts to determine conflict and effect, particularly since those courts may rely on evidence and testimony whose importance only becomes established at the trial.
Nor, finally, is automatic reversal simply an appropriate means of enforcing Sullivan’s mandate of inquiry. Despite Justice SOUTER’s belief that there must be a threat of sanction (to wit, the risk of conferring a windfall upon the defendant) in order to induce “resolutely obdurate” trial judges to follow the law, post, at 1263, we do not presume that judges are as careless or as partial as those police officers who need the incentive of the exclusionary rule, see United States v. Leon, 468 U.S. 897, 916-917, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). And in any event, the Sullivan standard, which requires proof of effect upon representation but (once such effect is shown) presumes prejudice, already creates an “incentive” to inquire into a potential conflict. In those cases where the potential conflict is in fact an actual one, only inquiry will enable the judge to avoid all possibility of reversal by either seeking waiver or replacing a conflicted attorney. We doubt that the deterrence of “judicial dereliction” that would be achieved by an automatic reversal rule is significantly greater,
Mickens, 535 U.S. at 172-73, 122 S.Ct at 1244-45. Thus, the Mickens Court concluded:
Since this was not a case in which (as in Holloway) counsel protested his inability simultaneously to represent multiple defendants; and since the trial court’s failure to make the Sullivan-mandated inquiry does not reduce the petitioner’s burden of proof; it was at least necessary, to void the conviction, for petitioner to establish that the conflict of interest adversely affected his counsel’s performance. The Court of Appeals having found no such effect, see 240 F.3d, at 360, the denial of habeas relief must be affirmed.
Id., at 174, 122 S.Ct. at 1245.
Notably, the Mickens Court made great effort in explaining the phrase “an actual conflict of interest” means “precisely a conflict that affected counsel’s performance — as opposed to a mere theoretical division of loyalties.” Mickens, 535 U.S. at 171, 122 S.Ct. at 1243. The Court clarified the term “was shorthand for the statement in Sullivan that ‘a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.’ ” Id. (quoting Sullivan, 446 U.S., at 349-350, 100 S.Ct. 1708). In a footnote, the Court went on to explain:
We have used “actual conflict of interest” elsewhere to mean what was required to be shown in Sullivan. See United States v. Cronic, 466 U.S. 648, 662, n. 31, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (“[W]e have presumed prejudice when counsel labors under an actual conflict of interest.... See Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)”). And we have used “conflict of interest” to mean a *33 division of loyalties that affected counsel’s performance. In Holloway, 435 U.S., at 482, 98 S.Ct. 1173, we described our earlier opinion in Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), as follows:
“The record disclosed that Stewart failed to cross-examine a Government witness whose testimony linked Glas-ser with the conspiracy and failed to object to the admission of arguably inadmissible evidence. This failure was viewed by the Court as a result of Stewart’s desire to protect Kretske’s interests, and was thus ‘indicative of Stewart’s struggle to serve two masters....’ [315 U.S.], at 75, 62 S.Ct. 457. After identifying this conflict of interests, the Court declined to inquire whether the prejudice |45flowing from it was harmless and instead ordered Glasser’s conviction reversed.”
Thus, the Sullivan standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An “actual conflict,” for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel’s performance.
Mickens, 535 U.S. at 172, n. 5, 122 S.Ct. at 1244.
In the instant ease, the District Court knew of the potential conflict arising from the representation of all three capital defendants by the same Indigent Defender Board. Under Sullivan, the court had the duty to make a Holloway inquiry when it knew “a particular conflict existed.” Sullivan, 446 U.S. at 347, 100 S.Ct. 1708. However, under Mickens, because “this was not a case in which (as in Holloway) counsel protested his inability simultaneously to represent multiple defendants; and since the trial court’s failure to make the Sullivan-mandated inquiry [did] not reduce the petitioner’s burden of proof[,] it was at least necessary, to void the conviction, for petitioner to establish that the conflict of interest adversely affected his counsel’s performance.”
Simply put, for reversal under Mickens, defendant must demonstrate the conflict of interest, i e., the multiple representation of adverse co-defendants, adversely affected his counsel’s performance. The trial record clearly shows defendant’s representation was not adversely affected. For instance, defendant’s trial counsel “ripped” into Nelson, attacking almost every statement he made regards both the Florida and Louisiana murders and trying to impeach his testimony based on his “plum” deal — a number of years for the crimes defendant was subject to death.
Additionally, there was no actual conflict in the attorneys’ representation of defendant at trial because none of these attorneys’ loyalties were divided. None of his attorneys jointly represented other defendants to whom the attorneys owed 14r,duties of loyalty. None of defendant’s counsel was called upon to cross-examine any of his former or current clients in the State’s prosecution, mandating reversal. See State v. Cisco, 01-2732 p. 19 (La.12/3/03); 861 So.2d 118, 131; State v. Carmouche, 508 So.2d 792, 805 (La.1987); State v. Rowe, 416 So.2d 87, 91 (La.1982). Nor were any of defendant’s attorneys called upon to take some action, or prevented from taking some action, based on a loyalty to another. Defendant was tried separately from his co-defendants. The surviving victim, James Nelson, and Danil Garcia all gave similar statements about the details of the crimes. Although defendant initially denied knowledge and involvement, his custodial statements eventually matched the others’ statements. The only detail in dispute was whether defendant or Nelson wielded the knife that killed Matt. There is no doubt both were principals to *34 the murder. Therefore, the “issue of conflicting loyalties” did not actually arise.
Moreover, defendant’s allegation D’Aquila’s role as chief defender representing all three co-conspirators created an actual conflict of interest in his role as defendant’s lawyer is meritless. Appellate counsel claims D’Aquila’s diverse roles created a conflict, not only because he was defendant’s lead attorney, but also because he was required to supervise the IDB attorneys appointed to represent the co-defendants, one of whom testified as the State’s key witness-James Nelson.
However, the hearing on remand showed the nature of D’Aquila’s statutory supervisory duties is wholly administrative rather than substantive. D’Aquila does not interfere with the independent professional responsibilities and judgment exercised by the contract attorneys. The provision of indigent services in the Eighteenth Judicial District has continued in that way since 1972. Notably, the |47Pistrict Court was moved during the hearing on remand to praise the integrity of D’Aquila.[62]
To the extent D’Aquila might be considered as representing all of the indigent defendants in the district due to his supervisory position, he was not faced with an actual conflict either. Tommy Thompson conducted the cross-examination of co-defendant, James Nelson. Nelson’s attorney, Yolanda Batiste, was present in court when he testified in the State’s case-in-chief. After the State rested, Thompson recalled Nelson to the stand in the defense case. After a brief three pages of testimony, Nelson sought to invoke his Fifth Amendment privilege, and all questioning ceased until Batiste could return to the courtroom to advise Nelson. Subsequently, Thompson resumed questioning Nelson. *35 Here, because D’Aquila did not cross-examine Nelson or try to impeach him, no actual conflict arose. See Cisco, 01-2732 at p. 25, 861 So.2d at 134 (cross-examination by second attorney, not conflicted, suggested as alternative to safeguard defendant’s Sixth Amendment rights); Reeves, 06-2419 at p. 79, 11 So.3d at 1082; State v. Tart, 93-0772, p. 21 (La.2/9/96), 672 So.2d at 126.
Finally, the record on remand shows when the potential for a conflict arose, the Eighteenth Judicial District Indigent Defenders had procedures in place to avoid such conflicts. Each independent attorney contractor had his or her own office. In conflict situations, these independent contractors worked the case flies from their private offices, with their private staff. In such situations, an indigent defender working in one of the other two parishes was called to represent a co-defendant. For example, here, Nelson’s case file was in Batiste’s office in Plaquemine. There was no coordination or discussion of defense strategy. Kimball, representing Nelson, explicitly refutes the conclusion there was any improper sharing of confidential information between counsel for defendant and his co-defendants. Likewise, defendant’s counsel explicitly rejected any implication the defenses worked together. In fact, D’Aquila was unaware Batiste was talking to the State on behalf of her client.[63]
The record on remand shows separate, independent counsel engaged in separate, independent defenses on behalf of Michael Garcia and his co-defendants. The goal of each independent attorney was to avoid imposition of the death penalty for his or her client and to represent each defendant to the best of his or her ability, underscoring the truly independent nature of the representation provided for all of the perpetrators of the crimes at issue.
|4!)Because there was no actual conflict of interest, we find the District Court’s actions comported with applicable law and the defendant received constitutionally effective, conflict-fi-ee representation.

Non-disclosure of James Nelson’s plea deal

In a separate assignment of error, appellate counsel claims the State “unlawfully concealed” from defendant’s jury its deal with its cooperating witness, James Nelson. Specifically, counsel alleges Nelson and the prosecutor unlawfully concealed from the jury the key motive for Nelson’s testimony — “the prosecutor would not seek the death penalty or a life sentence against him so long as he testified.” Counsel further avers defendant’s jury never had the benefit of a full airing of the State’s deal with Nelson, which came to fruition six months after defendant’s capital trial as counsel discloses to this Court:
According to district court records, Nelson pled guilty to one charge of conspiracy to commit second degree murder, three counts of forcible rape, one count of second degree kidnapping, and one count of armed robbery on December 2, 2008, six months after his testimony against [defendant].... He was ultimately sentenced to a 60-year sentence (because the sentences run concurrently) by Judge Free.
The record clearly shows otherwise. Contrary to the defense’s assertion, from the very outset of trial, the State explicitly informed the jury (1) it would not seek the death penalty and (2) probably would recommend a number of years for Nelson’s *36 cooperation. In his opening statement, the prosecutor explained to the jury:
Did we cut a deal with Fatbody [sic]? No. I told the victim that I am probably going to talk — and Fatboy doesn’t know this yet, because I told him no — but I’m going to tell you, I’m probably going to talk to somewhere in the years of 75 to 100 years for him. If he see[s] the light of day, that’s up to him and God. But I haven’t told him, and I told his lawyer, the only thing I’ll tell you is that he didn’t do the killing....
[[Image here]]
he cooperated from day one, let me tell what happened. We got them all. You will see and hear from him, man, I just thought, I just told Isotherm And he ain’t lying because we weren’t going to prosecute him for the death penalty, we are not going to prosecute the brother Danil for the death penalty. We prosecuted the main one and we prosecuted the killer for first degree murder.[64]
At the time of Nelson’s testimony, the State again apprised the jury, in exchange for his truthful testimony, it had agreed to take the death penalty off the table: “I told you I would take the death penalty off the case and let you tell the truth in front of this jury and this judge and leave it up to him....”[65]
On remand, the prosecutor, Tony Clayton, acknowledged Nelson’s sentence to a defined number of years:
MR. CLAYTON:
Mr. Nelson didn’t get the death penalty, did he?
MR. KIMBALL:
No.
MR. CLAYTON:
And he didn’t get life, did he?
MR. KIMBALL:
No.
MR. CLAYTON:
He got 65 years?[66]
MR. KIMBALL:
Yes, sir.
MR. CLAYTON:
And whether he has to do all of that 65 years is up to the Louisiana law. But the point I want to make, as a result of getting 65 years, he had to testify against Michael Garcia, didn’t he?
MR. KIMBALL:
Again, I wasn’t involved in that time, but I think he did testify, though, yes.[67]
Given this acknowledgment, we requested an opposition from the State in response to the defendant’s request for a second remand, directing the State to specifically address Clayton’s questioning. In response, the State stated Clayton’s quotations had been “wholly taken out of context” and still “unequivocally | ^maintains that no deal was made with James Nelson in exchange for his testimony.... The only promise made to James Nelson was that he would not be exposed to the death penalty or a life sentence, which was known to all parties; an uncontradicted fact in the record.”
Under well-established law, a prosecutor may not suppress evidence favorable to the accused and material to either guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Brady rule encompasses evidence that impeaches the testimony of a witness when the reliability *37 or credibility of that witness may determine guilt or innocence. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); State v. Knapper, 579 So.2d 956, 959 (La.1991). A Brady violation occurs when the “eviden-tiary suppression undermines confidence in the outcome of the trial.” Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995)(internal quotation marks and citations omitted).
This Court has held on numerous occasions a witness’s “hope or knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest.” State v. Brady, 381 So.2d 819, 821-22 (La.1980); see also State v. Vale, 95-1230, p. 4 (La.1/26/96), 666 So.2d 1070, 1072. “It is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence, but courts uniformly hold that such a witness may testify so long as the government’s bargain with him is fully ventilated so that the jury can evaluate his credibility.” United States v. Cervantes-Pacheco, 826 F.2d 310, 315 (5th Cir.1987) (footnote omitted). Moreover, Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) and Giglio both hold, when the “reliability of a given witness may well be determinative of guilt or innocence,” nondisclosure by prosecutor of evidence Ingoing to the credibility of a witness denies the defendant due process. Napue, 360 U.S. at 269, 79 S.Ct. at 1177; Knapper, 579 So.2d at 959.
Although the defense artfully tries to raise a Brady claim based on Nelson’s alleged deal, the State is correct the trial record clearly shows the jury was sufficiently made aware Nelson would not face the death penalty and may be sentenced to a term of years, not life imprisonment, for his participation in the State’s case. Significantly, defense counsel ensured the jury knew Nelson had a “deal” with the State for his testimony against defendant, and the “deal” was the primary basis for Nelson’s impeachment. The fact he was sentenced by the trial judge to a number of years six months after trial is immaterial given this disclosure and transparency before the jury.[68] Furthermore, in light of defendant’s admission he held the murder weapon when it plunged into Matt’s chest coupled with the statements of M.T. and the circumstances of the crime, any failure to fully disclose the specifics of a deal, which importantly was not effectuated until six months after trial, does not in any *38 way “undermine confidence in the outcome of [defendant’s] trial.” See Kyles, 514 U.S. at 434, 115 S.Ct. 1555. Accordingly, we find no Brady violation has occurred and defendant has not been denied due process.

Other Crimes Evidence

Iraln this assignment of error, defendant argues the improper and completely unrestrained admission of other crimes evidence at the guilty phase violated his right to a fair trial, due process, and reliable determination of punishment, which undermines the validity of his conviction and death sentence.
The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is, and has been, such evidence is not admissible to prove the accused committed the charged crime because he has committed other such crimes in the past or to show the probability he committed the crime in question because he is a man of criminal character. State v. Lee, 05-2098, p. 44 (La.1/16/08), 976 So.2d 109, 139; State v. Patza, 3 La. Ann. 512 (1848).
Nevertheless, although evidence of other crimes, wrongs, or acts may not be admitted to prove the accused is a person of criminal character, evidence of other crimes has long been admissible if the state establishes an independent and relevant reason for its admission. See State v. Anderson, 45 La. Ann. 651, 654, 12 So. 737, 738 (1893). This very principle is embodied in our Code of Evidence at Article 404(B)(1), which provides, in pertinent part:
Except as provided in Article 412 [regarding a victim’s past sexual behavior in sexual assault cases], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
La.Code Evid. art. 404(B)(1). While still prohibiting the state from introducing evidence of other crimes, wrongs, or acts to show a probability the accused committed the charged crime because he is a “bad” person, the rule articulated in | ⅛,Article 404(B)(1) allows admission for other purposes, i.e., to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La.Code Evid. art. 404(B)(1); Lee, 05-2098 at p. 44, 976 So.2d at 139; State v. Kennedy, 00-1554, p. 5 (La.4/3/01), 803 So.2d 916, 920.
Several other statutory and jurisprudential rules also govern the admissibility of other crimes evidence even when one or more of these permitted purposes is asserted. State v. Miller, 98-0301, pp. 3-4 (La.9/9/98), 718 So.2d 960, 962. Foremost, at least one of the enumerated purposes in Article 404(B)(1) must have substantial relevance independent from showing defendant’s general criminal character in that it tends to prove a material fact genuinely at issue. Lee, 05-2098 at p. 44, 976 So.2d at 139; State v. Moore, 440 So.2d 134, 137 (La.1983).
*39 Moreover, the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. Lee, 05-2098 at p. 44, 976 So.2d at 139; State v. Hatcher, 372 So.2d 1024, 1027 (La.1979). Separate and apart from the showing of relevancy and prejudice, the state must also prove the defendant committed the other acts, Lee, 05-2098 at p. 44, 976 So.2d at 139, and satisfy the requirements set forth in Prieur, i.e., the state must provide the defendant -with notice before trial it intends to offer prior crimes evidence.
Logically, it falls to the trial court in its gatekeeping function to determine the independent relevancy of such evidence and balance its probative value against its prejudicial effect. La.Code Evid. art. 403; Huddleston v. United States, 485 U.S. 681, 690-91, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988). Upon finding such relevance, the court must then balance all the pertinent factors weighing in favor of and against its admissibility. See C. McCormick, Evidence § 190, 768 (6th ed.2006). In this analysis, the court seeks to answer the question: Is this evidence so related to the crime on trial or a material issue or defense therein that, if admitted, its relevancy will outweigh the prejudicial effect, which the defendant will necessarily be burdened with?
The trial court’s answer to this question and its corresponding ruling on the admissibility of the additional other crimes evidence will not be disturbed absent an abuse of discretion, State v. Scales, 93-2003, pp. 4-5 (La.5/22/95), 655 So.2d 1326, 1330-31, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996). Finally, the erroneous admission of other crimes evidence has long been held subject to harmless error review. La.Code Crim. Proc. art. 921; State v. Johnson, 94-1379, pp. 14-15 (La.11/27/95), 664 So.2d 94, 100-01 (errors leading to improper admission of evidence subject to harmless-error analysis; error harmless if verdict “surely unattributable” to error)(quoting Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)).
As evident from the Prieur hearing, the District Court permitted the State to introduce the evidence under the purpose of establishing “at the minimum identity, if not plan.” We must now determine whether the District Court’s admission of the other crimes evidence was an abuse of discretion. See State v. Jackson, 352 So.2d 195, 196 (La.1977).
In its brief, the State argues all of its other crimes evidence- “was plainly necessary” and justifiably admitted to demonstrate Matt’s death was not accidental. However, as made clear from its brief, the State justifies admission of the other crimes evidence, not so much to refute defendant’s theory of accident, which actually needed no refutation beyond what the circumstances of the crime revealed, but because the other crimes evidence “exhibited a peculiar mode of operation to distinguish it as the work of one person, the defendant, Michael Garcia,” ie., modus operands “Michael Garcia’s mode of operation in his prior crimes leaves | mno doubt that he committed the First Degree Murder of Matthew Millican with system, motive, plan, preparation and absence of mistake or accident.” Therefore, the State concludes the evidence was relevant to prove motive, plan, system, identity, and absence of mistake or accident.
Recently, we once again acknowledged this Court has long sanctioned the use of other crimes evidence to show modus operandi, as it bears on the question of identity, when the prior crime is so distinctively similar to the one charged, especially in terms of time, place, and manner of commission, one may reason *40 ably infer the same person is the perpetrator in both instances. Lee, 05-2098 at pp. 44-45, 976 So.2d at 139 (allowing the admission of such evidence “particularly when the modus operandi employed by the defendant in both the charged crime and uncharged offenses is so peculiarly distinctive one must logically say they were the work of the same person”);[69] State v. Hills, 99-1750, p. 6 (La.5/16/00), 761 So.2d 516, 521; see, e.g., State v. Code, 627 So.2d 1373, 1381 (La.1993)(other crimes evidence admissible where it showed similar distinctive handcuff ligature, overkill, |,^predominant use of a knife, and need for domination and control of the victims to the extent of moving them from room to room), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994). The determination of this standard is essentially a balancing process: “The greater the degree of similarity of the offenses, the more the evidence enhances the probability that the same person was the perpetrator, and hence the greater the evidence’s probative value, which is to be ultimately weighed against its prejudicial effect.” Moore, 440 So.2d at 137-38.
Thus, the positive identification of a defendant as the perpetrator of a distinctively similar previous crime is often permitted to enhance the otherwise uncorroborated identification of that person as the perpetrator of the charged crime. In such cases, the evidence of the uncharged crime has much higher relevance and far greater probative value than evidence which merely indicates that the defendant has a propensity to engage in all kinds of criminal activity.

Id.

Here, there is no doubt the commonality of elements, namely (1) the same participants acting in the Florida murder and the Port Allen murder, (2) much of the same weaponry involved, (3) the initial motive of robbery, and (4) the violent sexual elements of humiliation, bondage, and degradation, all support the conclusion the Florida and Louisiana murders are so “peculiarly distinctive” they must logically have been committed by the same persons, who killed by design and not by accident. Regarding the remaining offenses, the principal themes the crimes have in common are Michael Garcia and the weapons he used to terrorize and demoralize his victims.
*41 In this light, L.W.’s testimony relating her tumultuous relationship with defendant, the domestic violence and rape she suffered at his hands, and the lengths to which she had to go for protection from defendant just seven months before the instant murder, go to answer the question of the identity of the perpetrator of the aggravated kidnappings at blade point and violent sexual assaults |fiSthat occurred, particularly given the strong similarity between the offense against L.W. and those against M.T, during the commission of the prosecuted crime.
Likewise, Daniel Corley’s testimony illuminates whether defendant or Nelson inflicted the fatal stab wound. Defendant’s threat to kill Daniel Corley with a machete is distinctively similar to Matt’s murder (in which the murder weapon was also a knife) to warrant an inference they were committed by the same person who used “vicious” blades to intimidate and assault his victims. Similarly, the testimony of Shyla Keys goes to answer who perpetrated the violent assaults and actually killed Matt. Cutting his girlfriend with a machete is sufficiently similar to Matt’s murder and the preceding violent assaults on both Matt and M.T. to warrant an inference they were committed by the same blade-wielding perpetrator who sought to dominate and demoralize his victims through the threat posed by his deadly knives.
Finally, the evidence regarding the subsequent burglary of Bessie Davies’s home and motor home, the theft and arson of Davies’s car, the theft of Tommy Fields’s truck, and the theft of an RV in Slidell was admissible given the close temporal and physical connexity to the charged crime. State v. Brewington, 601 So.2d 656, 657 (La.1992)(“This court has approved the admission of other crimes evidence when it is related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference to it.... In such cases, the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.”). Such evidence was necessary for the State to accurately present its case and complete the story of the crime on trial.
| ¡^Therefore, all the other crimes evidence was independently relevant to the crime on trial or a material issue or defense, i.e., lack of accident or mistake, so that their relevancy outweighed their prejudicial effect. Consequently, we find no error in the admission of the other crimes evidence in the guilt phase of defendant’s capital trial. Regardless, in light of the overwhelming evidence of defendant’s guilt presented to the jury — the various statements and the physical circumstances of the murder — the verdict was “surely unattributable” to any error in their admission, rendering said error harmless. See Johnson, 94-1379 at pp. 14-15, 664 So.2d at 100-01.
CAPITAL SENTENCE REVIEW
Under La.Code Crim. Proc. art. 905.9 and La.S.Ct.R. 28, this Court reviews every sentence of death imposed by Louisiana courts to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice, or other arbitrary factors; whether the evidence supports the jury’s findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The Department of Public Safety and Correction submitted a Capital Sentence *42 Investigation Report (“CSIR”). See La. S.Ct.R. 28, § 3(b). Notwithstanding correspondence from this Court reminding the trial judge of his obligation, Judge Free never filed the Uniform Capital Sentence Report (“UCSR”) as required by La.S.Ct.R. 28, § 3(a). The State and the defense each filed a Sentence Review Memorandum.
Those documents, along with the penalty phase testimony of defendant’s relatives, indicate defendant, Michael Garcia, is an Hispanic male, born on August 7, 1978, in Michigan to the legal union of Dena and Daniel Garcia. Defendant was |finthe second youngest of the Garcias’ five children. Defendant lived most of his life in Lansing, Michigan, until 2005, when he moved to Florida.
Defendant attended school in the Eaton Public School System in Lansing, but dropped out in the ninth grade, when truancy became a problem. Defendant earned his GED within the year, but sought no additional training or. college.
Defendant was raised Baptist and attended church with his mother, but there is no indication he attended beyond his childhood years. Defendant claims he was employed with U.S.A. Fence Company in Gibsonton, Florida, between October 2005 and January 2006, earning approximately $1,300 per month. Before that, defendant did general labor such as landscaping and lawn maintenance.
Defendant never served in the military. There is no indication defendant ever married, but he did father three sons with two women. At the time of defendant’s trial, his oldest child, by Shalisa Kittle, was twelve years of age. He also fathered two boys with L.W., born on May 18, 2004, and December 28, 2005.
Defendant’s mother denied he ever needed mental health treatment or substance abuse treatment. During his interrogation with Det. Dale Bunten from Florida, defendant confirmed, “I don’t do drugs.” However, defendant does consume alcohol.[70]
Defendant’s criminal history began as a juvenile. He was arrested June 12, 1994, September 19, 1994, January 31, 1995, and June 27, 1995, each time for juvenile curfew violation. No disposition of these four matters is known.
As an adult, defendant was arrested by the Lansing Police Department on December 20, 1995, and charged with two counts of felony breaking and entering. On January 10, 1996, defendant was convicted and placed on supervised probation. |fi1On February 18, 1998, defendant’s probation was revoked, and he was sentenced to serve 36 to 120 months in the Michigan Department of Corrections, with credit for 334 days.
On June 9, 1997, defendant was arrested by the Lansing Police Department and charged with receiving stolen property, a vehicle. On April 1,1998, he pled guilty to the charge of receiving and concealing $100 and was sentenced to serve one to five years in the Michigan Department of Corrections, with credit for 156 days (sentence to run consecutive with his previous sentence for breaking and entering).
On February 20, 1999, defendant was arrested by the Lansing Police Department and charged with escape. On February 24, 1999, defendant pled guilty and *43 was sentenced to serve one to five years in the Michigan Department of Corrections.
On May 12, 2005, defendant was arrested by the Lansing Police Department and charged with open alcohol container and prowling. On May 24, 2005, defendant pled guilty to both charges. He was ordered to pay $150 fine or serve 60 days on the first charge, and $100 fine or serve four days on the second charge.
On February 11, 2006, defendant was arrested in West Baton Rouge Parish and charged with first-degree murder, armed robbery, aggravated rape, and second-degree kidnapping. On June 6, 2008, defendant was found guilty of first-degree murder; on June 7, 2008, the jury recommended defendant be sentenced to death.
On March 9, 2007, defendant was arrested for attempting to escape from the West Baton Rouge Parish jail. He was charged with criminal damage to a pipeline facility, simple escape, aggravated escape, and taking contraband to/from a penal institution. No disposition of these charges was provided. During defendant’s capital trial, the State introduced evidence of defendant’s participation in the | ^January 2006 capital murder of Bessie Davies in Gibson-ton, Florida. Apparently, no charges have been filed in that case. Evidence of additional unadjudicated conduct was also introduced at the guilt phase of defendant’s trial.
Defendant did not testify at either the guilt phase or the penalty phase of his trial. However, his sister, Danielle Rene Granada, testified at the penalty phase. Danielle testified she works cleaning houses with her mother, and she is one year younger than defendant. She recalled their father drank daily and excessively, and abused their mother when he did. She testified, when they were younger, their inebriated father would get the sleeping children out of bed and lecture them about their Hispanic race and to be proud of who they are and work hard. However, Danielle testified all of her siblings got into trouble with the law at one time or another during their teen years. None of the Garcia children finished high school, and the neighborhood they grew up in had a lot of drug and gang activity.
Defendant’s father, Daniel Garcia, testified he had been born and raised in Lansing, Michigan, and at the time of trial, married 40 years to defendant’s mother. Defendant’s mother, Dena Garcia testified she was also born in Lansing, Michigan.
PASSION, PREJUDICE, AND OTHER ARBITRARY FACTORS
The first-degree murder of Matthew Millican occurred on February 8, 2006, and following jury selection, trial commenced on June 4, 2008, just over two years after the crime was committed. Although the victim was a homeless drifter, he had roots in West Baton Rouge Parish and had contemplated marrying and settling down there. A few articles about the murder appeared in the Port Allen News after the arrest of the Garcia brothers following a three-day manhunt.
The defense never moved for change of venue. During voir dire, the parties were able to successfully seat a jury of 12, plus two alternates, without incurring |fiSany responses to suggest the pre-trial publicity was so widespread as to affect any of the jurors ability to render a fair and impartial decision.
Appellate counsel cited numerous instances of prosecutorial misconduct he claims interjected arbitrary factors into the proceedings, including the State failed to prevent its witnesses from commenting on defendant’s race and the prosecutor cultivated a sense of localism against the Michigan defendant. These claims were *44 addressed fully in the unpublished appendix and found to lack merit.
Defendant is Hispanic, and victims Matthew Millican and M.T. were Caucasians. Otherwise, race was not a factor in defendant’s trial. The race of the jurors was not documented in this case,[71] and there was never a challenge under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
Finally, appellate counsel argues the State’s introduction of overwhelming other crimes evidence at the guilt phase of his capital trial prejudiced defendant and shifted the focus from the question of guilt or innocence to defendant’s character and propensities. The trial judge failed to balance the probative value of other crimes evidence against “the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” La.Code Evid. art. 403. We found no error in the admission of this evidence in the guilt phase, and all of the other crimes evidence was admissible at the penalty phase to reveal defendant’s character and propensities.
AGGRAVATING CIRCUMSTANCES
The State relied on two aggravating circumstances under La.Code Crim. Proc. art. 905.4(A)(1), and the jury returned the verdict of death, agreeing both aggravating circumstances were supported by the evidence: (1) the offender was | ^engaged in the perpetration or attempted perpetration of armed robbery; (2) the offender was engaged in the perpetration or attempted perpetration of aggravated kidnapping. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). M.T. testified she and Matthew Millican were robbed of approximately $30 by defendant and his two co-conspirators, while the three men were all armed with a variety of knives, machetes, and samurai swords. She further testified she and Mil-lican were taken from where they had been sleeping, blindfolded, and then led into the woods by the three men, who all brutally raped her in front of Matt. The jury’s finding of two aggravating circumstances was fully supported by the evidence. Consequently, the death sentence is firmly grounded on the finding of those two aggravating circumstances.
PROPORTIONALITY
Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990); State v. Wille, 559 So.2d 1321, 1341 (La.1990); State v. Thompson, 516 So.2d 349, 357 (La.1987). This Court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently “large number of persuasive mitigating factors.” State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987)(in case reversed on other grounds, dictum suggesting death penalty disproportionate).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury’s recommendation of death is inconsistent |fifiwith sentences imposed in similar cases in the *45 same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d at 7.
The State’s Sentence Review Memorandum (SRM) failed to comply with Rule 28 procedures because it completely omits a listing or discussion of “each first degree murder in the district in which sentence was imposed after January 1, 1976.” In the defense SRM, appellate counsel chides the State for not detailing “at least” 29 cases, besides the instant case, which originated in the 18th JDC as first-degree murders for comparison purposes under proportionality analysis. According to appellate counsel, defendant’s death sentence is the first handed down in the 18th JDC in the modern era, ie., since 1976.
By initiating his own research via public records request letters, appellate counsel listed eases in the 18th JDC, which is comprised of West Baton Rouge, Iberville, and Pointe Coupee Parishes, beginning with an indictment for first-degree murder, but counsel gave no disposition beyond date of indictment:

West Baton Rouge Parish

State v. Henry Davis, indicted 1/9/99
State v. Kelvin Metz, indicted 6/10/92
State v. Donald Franklin, indicted 2/4/89
State v. Ervin Allen, indicted 6/12/07

Iberville Parish

State v. Sernell Moore, indicted 1/30/95
State v. Donald Jackson, indicted 1/30/95
State v. Tommy Floyd, indicted 9/28/94
State v. Michael Davis, indicted 1/29/93
State v. Eugene Mitchell, indicted 9/30/93
State v. Johnny Lathers, indicted 3/17/99
State v. Jerome Gray, indicted 5/27/99
State v. Jamil Clark, indicted 8/24/00
State v. Ervin Allen, indicted 8/30/07
State v. James Thomas, James Ross, Carl Nash and Percy Dyer, indicted 8/21/96
State v. Brian Mosby, indicted 5/27/99
State v. Clyde Joseph, indicted 12/4/96
State v. Todd Allen, 450 So.2d 1378 (La. App. 1st Cir.1984)

16SPointe Coupee Parish

State v. Andrew Morgan, indicted 10/10/02
State v. Rivious Harrington, indicted 6/14/99
State v. Fredrick Franklin, indicted 11/6/95
State v. Eldridge Dukes, indicted 2/12/96
As this Court’s recent per curiam in State v. Bordelon, 07-0525 (La.10/16/09), 33 So.3d 842, emphasizes, there now exists a sufficiently large number of capital cases on a state-wide basis in several areas, e.g., armed robbery murders, murders during a rape or aggravated kidnapping, or during a home invasion, that, even assuming the pool of similar cases which did not result in death is also significant, the death penalty does not appear to reflect the “‘wanton and freakish infliction of capital punishment.’ ” Bordelon, 07-0525 at 45, 33 So.3d 842 (quoting State v. Frost, 97-1771, p. 27 (La.12/1/98), 727 So.2d 417, 438).
In such cases, capital sentence review as a matter of Rule 28 retains its focus on the circumstances of the crime and the background of the offender, as in any other case in which the sentence is reviewed for exeessiveness as a matter of La. Const. Art. I, § 20. See State v. Telsee, 425 So.2d 1251, 1253-54 (La.1983)(re-view of sentences for excessiveness is a cumulative process which “focuses on a combination of ... factors ... [including] the nature of the offense and the offender .... [and] comparison of the defendant’s punishment with sentences imposed for similar crimes by the same courts and *46 other courts.”). Thus, as an inevitable consequence of the emphasis on individualizing punishment in a given case to the particular offender and the circumstances of the crime, comparative proportionality-review, in a system which otherwise adequately channels a jury’s sentencing discretion, is of limited importance as it cannot, nor can it be expected to, produce uniformly consistent results. See Pulley, 465 U.S. at 54, 104 S.Ct. at 881 (“Any capital sentencing scheme may occasionally produce | fi7aberrational outcomes.... As we have acknowledged in the past, there can be no perfect procedure for deciding in which cases governmental authority should be used to impose death.”)(internal quotation marks and citations omitted).
At any rate, for all that appears, the instant capital verdict is the only death sentence returned by a jury in the 18th JDC since 1976. Given the scarcity of comparable cases in West Baton Rouge Parish, it is appropriate for this Court to look beyond the 18th JDC and conduct the proportionality review on a state-wide basis. State v. Davis, 92-1623, pp. 34-35 (La.5/23/94), 637 So.2d 1012, 1030-31. Cases are legion in which this Court has affirmed capital sentences based primarily on the jury’s finding the defendant killed the victim in the course of an armed robbery or an aggravated kidnapping. See, e.g., State v. Leger, 05-0011 (La.7/10/06), 936 So.2d 108 (death sentence rested on, inter alia, jury’s finding defendant killed the victim during the course of an aggravated kidnapping or second-degree kidnapping); State v. Ball, 00-2277 (La.1/25/02), 824 So.2d 1089 (patron robbed bar and killed -beer delivery man in the course); State v. Anthony, 98-0406 (La.4/11/00), 776 So.2d 376 (ex-employee returned to restaurant, shot four employees during armed robbery, killing three); State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162 (exemployee returned to restaurant, shot and killed two people, and injured two others during the course of an armed robbery); State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801 (defendant and co-defendant shot and killed police officer escorting grocery store manager who was making a night deposit); State v. Brumfield, 96-2667 (La.10/20/98), 737 So.2d 660 (same); State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703 (defendant murdered victim while attempting to rob him in his truck; earlier that day, defendant had shot and wounded another victim during an attempted armed robbery); State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364 (during armed robbery in a restaurant where | ^defendant had previously worked, he shot and killed one employee and shot and permanently paralyzed another); State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326 (defendant, while engaged in the armed robbery, shot and killed one of the employees of a restaurant); State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865 (defendant kidnapped the victim while stealing his truck and ultimately drove him to a secluded area and shot him three times in the head).
Compared to these cases, we cannot say the death sentence in this case is disproportionate.
DECREE
For the reasons assigned herein, the defendant’s conviction and death sentence are affirmed. This judgment becomes final on direct review when either: (1) the defendant fails to timely petition the United States Supreme Court for certiorari; or (2) that Court denies his petition for cer-tiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehear- *47 mg. The District Court shall, upon receiving notice from this Court under La.Code Crim. Proc. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La.Rev.Stat. Ann. § 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. Ann. § 15:169; and (2) to litigate expeditiously the claims raised in that application, if filed in the state courts.
AFFIRMED.
WEIMER, Justice, dissents and assigns reasons.
CLARK, Justice, will additionally concur for reasons to be assigned.

. The six-count indictment also charged defendant with three counts of aggravated rape (anal, vaginal, and oral) against M.T., one count of armed robbery, and one count of aggravated kidnapping. On May 28, 2008, however, the State gave notice it was proceeding to trial against defendant as to count one of the indictment only, the first-degree murder charge. All other counts were severed, but not dismissed.

. A typographical error appears in the minute entry for March 3, 2006, which purports defendant entered a plea of guilty at his arraignment.

. La.Rev.Stat. § 14:64 defines "armed robbery" as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.”

.La.Rev.Stat. § 14:44 defines "aggravated kidnapping” as
the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.

. All facts contained in this section have been compiled from the various statements of the parties and testimony at trial and during preliminary hearings.

. Matt’s date of birth was April 18, 1973.

. M.T.'s date of birth is August 27, 1981; she is now deceased. At the preliminary hearing held on February 21, 2006, M.T. testified that, before the murder, she and Matt had been on the road together for about a year and lived by panhandling. Hitch-hiking and riding freight trains, they traveled to Louisiana from Salt Lake City, Utah, to visit his family for Christmas. Within the month preceding the murder, the couple arrived in Louisiana and traveled between Port Allen and New Orleans. "Matt had just gotten his I.D., and [they] were going to try and get jobs and settle down, be near his family.” Prior to meeting, both Matt and M.T. had traveled the continental U.S. on their own for about four or five years.

. Hollywood’s given name is Robert James Peterson. At trial, he testified in prison garb, as he was serving tíme in California "for assault with great bodily injury.” He explained to the jury he was in jail for "beating up a child molester.”

. Defendant’s date of birth is August 7, 1978, Danil Garcia's date of birth is February 6, 1971, and James Nelson’s date of birth is March 13, 1984.

. M.T. explained she and Matt decided to move their mattress because the glass doors of the cooler in the Texaco station had been broken and they did not want to get blamed for the damage and did not want her puppy to step on the broken glass. Also, they did not know or feel comfortable with the three strangers.

. M.T. testified she did not learn Nelson or Danil's name until after the ordeal because defendant, called Mike by the other two men, was just calling them his lieutenants.

. According to Nelson’s custodial statement, this happened around 3:00 in the morning.

. All three men were armed with machetes. Nelson had a small knife as well, and defendant also had a K-bar knife "with a serrated edge on top” and a samurai sword in a sheath at his waist.

. During the preliminary examination, M.T. testified defendant held the K-bar knife to Matt’s chest. However, at trial, M.T. testified defendant was armed with a machete at that point. She described his samurai sword as a machete as well.

. Actually, as the police video of the scene depicts, the trio had to step around Hollywood’s make-shift bed to even reach the couple’s mattress.

. Photos of the cutting in the trees and bushes leading up to the crime scene were introduced into evidence. As seen in the video, the pathway to the scene was cleared at times apparently by a machete.

. In her preliminary examination testimony, M.T. explained defendant and Nelson "kept going off to discuss I guess what they were going to do with us."

. After defendant ejaculated, M.T. "kind of put [her] sleeve up and spit it down the side of the sleeve without him noticing .... [b]e-cause [she] thought they might be able to test it later so that [she] could prove he did that.” In admittedly poor evidence collection, the State failed to retrieve the shirt from the bathroom where she last discarded it and sent it home to M.T. in California. By the time the mistake was noticed, the shirt had already been laundered, effectively destroying any trace of the DNA she sought to preserve.

. Regarding her state of mind, M.T. explained she was "mostly afraid for Matt ... he looked really beat up in the face and I was really worried about him and I thought they were going to kill my puppy. I didn't care. I just didn't want them to hurt Matt anymore.”

. As the video and photos depict, this muddy edge is only a few feet from the water.

. Video of the scene depicts three large, piling-size holes on the bank just short of the drop off.

. M.T. explained she did not scream to him at this point because the men, all armed and alert, threatened to kill her, her dog, and Hollywood if she did.

. When asked by the prosecutor, "You weren’t afraid, man? You weren't scared?” Hollywood responded, "I meet a lot of different people in my life, man.”

. M.T. testified she had his number written on her arm.

. M.T. explained: "I thought I might be able to know where he was. But I couldn’t because it was dark when we were back there.”

. Louisiana State Police, the Federal Bureau of Investigation (FBI), the Sheriff’s Office, and city police were all involved. The manhunt employed Angola State Penitentiary and Hunt Correctional Facility canine chase teams as well as helicopters equipped with Forward Looking Infrared Devices (FLIR). The police also employed a technique known as triangularization of the Garcia brothers' cellphone signals to pinpoint a GPS location, narrowing the search area to "a mile and a half or two miles.” Several "Be On the Look Outs” (BOLO) were issued to the public as well.

.The actual location of the machetes as well as the murder weapon, which all had been hidden by ramming their blades down into the ground, was only learned from a recorded discussion the Garcia brothers had while left alone in a detective’s office during a break in their joint interrogation.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Danil statement was summarized as follows:
They went there to rob the couple. They robbed them, covered their heads and took them into the woods. He said they raped the woman and stated his brother and James tied up the man, beat him and took him away. He said he heard the victim yell out in pain and then saw his brother and James come back alone and wet. He stated that the three of them then took the girl to the abandoned Texaco and raped her all night.

. This narrative was dictated by Detective Charles A. Hotard of the West Baton Rouge Sheriff’s Office.

.Between the time of defendant’s arrest and his trial, the Legislature restructured the provisions governing legal services to indigent defendants in Louisiana. As part of this restructuring, the name "Indigent Defender Board” was changed to "Public Defender’s Office.” See generally, La.Rev.Stat. § 15:141, et seq. (the "Louisiana Public Defender Act” enacted by 2007 La. Acts 307, § 1, effective August 15, 2007). The first name, "Indigent Defender Board” and its abbreviation "IDB” are used in this opinion for purposes of concision and simplicity. Unless otherwise noted, Indigent Defender Board and Public Defender’s Office have the same legal significance.

. Just as the name "Indigent Defender Board” changed to "Public Defender’s Office” with the enactment of the "Louisiana Public Defender Act” (La.Rev.Stat. § 15:141, et seq.), D’Aquila's title changed from "Chief Indigent Defender” to "district public defender” or "chief indigent defender.” See La.Rev. Stat. § 15:143. In this opinion, D'Aquila’s title will be referred to simply as "chief” or "chief indigent defender,” and unless otherwise noted, no legal significance is to be attached to the different wording of his job title.

. Thompson testified on remand he acted as first chair for defendant’s defense, covering primarily all of the guilt phase of the trial. Mr. Nelson testified on remand he acted as third chair, volunteering to help both Thompson and D’Aquila.

.Kimball testified at the hearing on remand he was first called into the case when all of the defendants were arrested for first-degree murder. He worked on Nelson’s case until Nelson was indicted on a lesser charge. At that time, Yolanda Batiste took over Nelson’s defense because Nelson no longer required two persons working on the case after the reduction in charge.

. We note defendant’s attorney stipulated to probable cause to hold his client for first-degree murder at the outset of the hearing.

. In 2006, Danil Garcia, who was charged with second-degree murder, three counts of aggravated rape, armed robbery, and second-degree kidnapping, pled guilty after jury selection to second-degree murder. In exchange, the State dismissed the remaining charges. Before sentencing, Danil Garcia filed a motion pro se to withdraw his guilty plea, which the District Court (Free, J.) denied. The District Court sentenced him to serve life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The court of appeal affirmed in an unpublished opinion, State v. Garcia, 09-0177 (La.App. 1 Cir. 6/19/09), 11 So.3d 1246, and this Court denied writs, State ex rel. Garcia v. State, 09-1804 (La.6/4/10), 38 So.3d294.
On December 2, 2008, James Nelson pled guilty to one charge of conspiracy to commit second-degree murder, three counts of forcible rape, one count of second-degree kidnapping, and one count of armed robbery. He was ultimately sentenced to a total term of 60 years imprisonment at hard labor.

. State v. Jackson, 608 So.2d 949 (La.1992).

. Alternatively, the State argued the acts of violence committed against M.T. on or about February 8, 2006, are considered res gestae and hence not subject to the notice and/or hearing requirement for introduction in the State’s case-in-chief.

. State v. Prieur, 277 So.2d 126 (La.1973).

.Det. Johnson participated in the arrest and interrogation of defendant, James Nelson, and Danil Garcia. Det. Johnson also worked closely with Detective Dale Bunten of Hills-borough County, Florida, who was investigating the Gibsonton murder of Bessie Davies and, as part of that investigation, flew to Baton Rouge to question the three defendants about the Florida case.

. Det. Johnson further disclosed defendant made a jailhouse confession regarding the Florida and Port Allen murders to his cellmate, Thadeous Wells, who Det. Johnson confirmed was "absolutely not” working with the police at the time defendant made his confession. From a transcript of Wells's statement to Det. Bunten, Det. Johnson read: "Mike told me he did all the killing.... He said he should have killed James and that, uh, female, [M.T.] too, and he wouldn't be in jail right now.” Wells further told Det. Bunten the Garcia brothers met Nelson at some sort of carnival. He also stated defendant said he used a machete in the Florida murder. The jurors, however, never heard defendant's jailhouse confession as Wells was not called as a witness at trial.

. At this point in its argument, the State explained it would show defendant actually committed the crime against Bessie Davies (1) through James Nelson’s testimony and defendant’s own words to Thadeous Wells, and (2) under the law of principals, which ironically applies in this case as well and provides: ”[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.” La.Rev.Stat. § 14:24. By participating in the armed robbery, sexual assault, and homicide, defendant was a principal to Davies’s first-degree murder, regardless of which of her attackers inflicted the fatal wounds. Likewise, by participating in the armed robbery and aggravated kidnapping beforehand, and then walking Matt to the water’s edge, stabbing him, and pushing his body into the water, both defendant and Nelson were principals to first-degree murder, regardless of which one inflicted the fatal stab wound.

. The State also advanced the purpose of showing absence of mistake or accident for the introduction of the evidence when it sought to admit, over defense counsel’s objection, photos from the Florida murder scene, including the graphic photo of Bessie Davies's decomposed body as found bound at the scene:
DEFENSE COUNSEL:
Judge, we object to him showing them, first of all, because I think the prejudicial effect certainly outweighs any probative value they might have. And this is other crimes evidence. This has nothing to do with the main crime. If you are trying to show cause of death and all of that—
THE COURT:
I guess this is my question to the State then: what is the purpose — what are you trying to show- — guilty knowledge, absence of mistake or accident, intent, system, motive, or identity?
STATE:
System, motive.
THE COURT:
And what system would that be?
STATE:
By binding and gagging her, that he used a machete, that they were—
[[Image here]]
We have blunt force trauma to the head, the same as in our victim. This is the object that was used for blunt force trauma [indicating photo of dumbbell as found at the scene].
[[Image here]]
And you’ve got the gagging, and the same thing gagging with our victim and you’ve got a knife to the throat. In this case, you've got a knife to the throat by one of the same weapons.
THE COURT:
While the Court does understand that it will be prejudicial, I think the probative value is outweighed — it does outweigh the prejudicial effect because of the other crimes evidence based on the system that the State is trying to present through the Prieur evidence, so I'm going to let it in.
STATE:
And absence of mistake because he said in another one that it was a mistake and we will show that it is the same—
THE COURT:
What was a mistake?
STATE:
He said it was an accident in our case. And we are going to show the same manner of being stabbed in the throat and *18 neck area wasn't a mistake here and it wasn’t a mistake there....

. At the outset of the hearing, counsel conceded the defense was not prepared to argue the motion, "because we've not had an opportunity to send our investigators out to see if any of this is true or if she tells us a different story.”

. Notably, it is well-settled the State is entitled to introduce evidence of a capital defendant’s unrelated convictions and unadjudicat-ed crimes at the penalty phase as reflective of his character and propensities. State v. Comeaux, 93-2729, p. 6 (La.7/1/97), 699 So.2d 16, 20, cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998).

.On May 22, 2008, the State again supplemented its answer to defendant’s Jackson demand to include its intent "to introduce evidence of an attempted simple escape, criminal damage to a prison facility, and entering contraband into a penal facility which the defendant was involved in at the West Baton Rouge Parish Detention Center on or about March 9, 2007.” On June 7, 2008, the State filed another supplement, which included its intent "to introduce evidence of an ‘aggravated’ escape, criminal damage to a prison facility, and entering contraband into a penal facility which the defendant was involved in at the West Baton Rouge Parish Detention Center on or about March *19 9, 2007." We note these other crimes were not introduced at trial.

. Interestingly, at defense’s request, the District Court read the following limiting instruction prior to this statement:
I want to read to you guys one of the instructions that I will read to you later. And it is regarding proof of other offenses, so you need to know this.
(Reading) Evidence that the defendant was involved in the commission of another offense or other offenses, other than the offense for which he is on trial, is to be considered only for limited purposes. Such evidence can be admitted to show guilty knowledge, absence of mistake or accident, intent, system, motive, or identity. For sex offenses, such evidence may be considered for its bearing on any matter to which it is relevant. Remember that the accused is on trial only for the offense charged. You may not find him guilty of this offense merely because he may have committed another offense.

. Likely a typographical error, the machete is interchangeably referred to by the names "Grandfather” and “Godfather” throughout the trial transcript.

. While the defense moved for a mistrial after the witness spontaneously volunteered defendant's previous incarceration, the District Court denied the motion because the defense had asked the open-ended question of "when did you and defendant first start to have a romantic relationship?"

. After the prosecutor concluded, defense counsel gave an after-the-fact objection: "Judge, I’m going to ask that [the prosecutor] not testify and not lead the witness.”

. This remark prompted no objection by defense counsel.

.Counsel moved for a mistrial based on L.W.'s reference to defendant’s incarceration. However, the district judge disagreed, finding the witness's statement was sufficiently vague to deny the mistrial: "Out of what, that’s the question, out of this trouble, out of this predicament, out of this state, I mean that — ... Motion for mistrial is denied.”

. At the outset of her direct testimony, the district judge cautioned Shyla to refrain from any reference to defendant being in prison. Given the court's previous admonishment to the witness, defense counsel moved for a mistrial. The court denied counsel’s motion:
It is not a mandatory ground for mistrial. Is it so prejudicial as to not be able to give him a fair trial that she spoke to him from jail? I think not, especially in light of the testimony she just put on him.
At the side bar discussion, District Attorney Ricky Ward remarked: "This jury knows he is *23 in jail. You don’t think they have figured that out by now.” The statement recognizes a fairly universal, but perhaps unspoken, truth.

. The exact date of her murder is unknown. Davies was last seen by her neighbors and last appeared on the security cameras at the Shell station where she worked on January 9, 2006.

. Significantly, defense counsel, in its casein-chief, recalled Nelson to the stand to read to the jury a letter, which he admitted he had written to defendant while they were incarcerated at the West Baton Rouge Parish jail awaiting trial on these charges, and which seemed to contradict his direct testimony concerning who actually stabbed the Florida victim:
(cont.)
A. It says that, "The Florida case, no, not really, I mean she wasn't breathing because I put my hand on her chest, and her neck arteries wasn’t squirting blood like they would have if she was still alive and her heart pumping. The dagger is actually a hunting knife, I tried to run it across her throat, but it wouldn't cut, so I ran the machete across her throat. The knife is gone and it shouldn't be found, and the machete is in the evidence we had down here. I don’t know about the dumbbell. And, then, I asked, What do you mean you see a good chance of these charges? That there is a good chance of beating them? ... Q. That’s all that it says? And, you wrote this?
A. Yes, I did.
Q. And, it’s the truth ain't it?
A. No, it ain’t.
Q. It’s a lie?
A. Yes, it is.
The same letter reveals Nelson's direct testimony may have understated his sexual actions in Florida as well:
With the victim in Florida I penetrated her vaginal but no where else and no I did not ejaculate in her. I pulled out way before and finished by jacking off.

. It is not clear from the record to whom the stolen RV belonged.

. The State did, however, revisit the DNA issue raised in the Florida case during its cross-examination of the defense's DNA expert.

. We note, even in such circumstances, under the law of principals, both defendant and Nelson would be principals to first-degree murder, regardless of which one inflicted the fatal stab wound. La.Rev.Stat. § 14:24. Additionally, both defendant and Nelson would be eligible for capital punishment under this Court's holding in State v. Anthony, 98-0406, pp. 13 (La.4/11/00), 776 So.2d 376, 386 (State is not required to show defendant actually pulled the trigger to sentence him to death in a first-degree murder prosecution; instead to carry its burden of proof successfully, the State must prove defendant acted in concert with his co-perpetrators, defendant had the specific intent to kill, and one of the aggravating elements enumerated in the first-degree murder statute was present), cert. denied, 531 U.S. 934, 121 S.Ct. 320, 148 L.Ed.2d 258 (2000). Regarding punishment, the question of which co-participant actually inflicted the fatal blow in a homicide resulting from the concerted action of two or more co-participants is relevant to the jury’s assessment of moral culpability in a capital sentencing proceeding. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

 U.S. Const, amend. VI provides:
In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

. La. Const, art. I, § 13 provides:
When any person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self incrimination, his right to assistance of counsel and, if indigent, his right to court appointed counsel. In a criminal prosecution, an accused shall be informed of the nature and cause of the accusation against him. At each stage of the proceedings, every person is entitled to assistance of counsel of his choice, or appointed by the court if he is indigent and charged with an offense punishable by imprisonment. The legislature shall provide for a uniform system for securing and compensating qualified counsel for indigents.

. Hearings were held on November 18, 2011, December 1 and 2, 2011, and January 17, 18, 19, and 20, 2012.

. On the record, the District Court explained:
And I feel compelled to say this, I just have to, because I would not be much of a human being if I didn't. If I were in a crack or if I were in a position where, or my son or my daughter were in a crack, I have absolutely no qualms with hiring Mr. D'Aquila to represent them, I can tell you that. As a matter of fact, I would try to become poor real quick because I had rather get his services for free. I just know how he is, I've seen him in too many trials where he looks like he's about to have a heart attack he’s so vehement about his clients and what he is trying to do for them and I don’t think this record will present to the appellate courts just how strongly this man represents his clients. It's not just oh, it's just a job and I’m going home it's over now, it's not that at all, he actually gets almost personal about it, you know, like you want to send him to the death chamber. He takes this stuff seriously and he takes his — I've seen this a bazillion times with him. He is so adamant about his representation and how strongly he feels about his clients’ positions. And I don't want this record to [leave] anyone thinking that he just treats them like some ole poor people that that’s the best they are going to get. He is not that way and I want to make sure that the — I know [Chief] Justice Kimball, when she reads this, she knows how this man is. The rest of them I don't want them thinking, or the U.S. Supreme Court reading it and saying, oh, this guy just didn't care about this guy. That’s not true. I mean this man goes — and Mr. D’Aquila don’t take this the wrong way — almost into conniption fits whenever it is not going his way, I’ve seen it too many times.
I want this on the record but not as far as my considerations as far as how I rule as to whether or not they are employees or independent contractors.
But the case we spoke of in Pointe Cou-pee, the other death penalty case, one vote came back saying give him life. This man put his head on the table and started crying, he was that emotional, he was that much into saving this boy's life. And he takes them all like that. So I don’t want it to come across to the courts that he doesn't care, because he does, he really does. I’ve seen this with my own eyes. And I want you to understand that, too, that this man cares, he does.

. D'Aquila testified it never entered his mind to fire Batiste for purstdng what was best for her client, as Nelson had the right to do whatever he believed was in his interests in his case.

. Trial Record, Vol. 9, pp. 2149-51.

. Trial Record, Vol. 10, p. 2293.

. Nelson was actually sentenced to 60 years, see supra.

. Supplemental Record, pp. 755-56.

. During the pendency of the instant appeal, appellate counsel has continued to pursue his claim of Brady violations arising from the State’s alleged concealment of its deal with Nelson from the jury by filing his “Motion to Relinquish Jurisdiction for Additional Discovery and a Hearing on Potential Brady Violations in Connection with the State's Deal with Co-Defendant James Nelson," filed in this Court on April 5, 2010, which outlines the total 60-year term Nelson received on reduced charges, courtesy of his State cooperation. On February 14, 2011, after this case was scheduled for oral argument, appellate counsel filed with this Court "Extraordinary Motion to Relinquish Jurisdiction for a Hearing to Prove that Michael Garcia is Entitled to a New Trial for the State’s Brady and Napue Violations in Connection with the State’s Deal with Co-Defendant James Nelson.” Attached to counsel's Extraordinary motion is a 10-page handwritten affidavit, apparently penned by appellate counsel and signed by Nelson and dated October 28, 2010. In it, Nelson avers he met with Clayton the day before he testified at defendant’s trial and, at that meeting, was led to believe his sentence would be "10-15 years” as long as Nelson testified “Michael killed the dude intentionally to get the deal. Clayton told me in the meeting that he had talked to the DA in Florida who told him that they wouldn't prosecute me in Florida if I took the deal and helped out here. I thought the deal gave me immunity.” We find these claims neither supported by the record nor meritorious.

. Significantly, in Lee,
FBI Agent Maty Ellen O'Toole, an expert in criminal investigative analysis, testified for the State at the Prieur hearing about the victims’ similarities and how they demonstrated a consistent modus operandi. Her analysis indicated all the victims were attractive, successful adult women. All the victims had "low-risk” lifestyles that would not likely put them in situations in which they could become a victim of violent crime. Moreover, all the victims were alert and not incapacitated at the time their attacks' began, and each had recently traveled in the area. O’Toole noted the first confrontation by the victims' attacker was in a "comfort zone,” most being in or near their homes. There were no signs of forced entry in any of the attacks. Each victim appeared to be disarmed nonviolently, with the attacks beginning only after they were subdued. All the victims were moved around their "comfort zones” during the attacks, and none of the victims appeared to have provoked their assailant’s violence and anger.
Lee, 05-2098 at p. 48, 976 So.2d at 141. We further held: "although the State’s presentation of other crimes evidence occupied half of the guilt phase of trial, the State used this evidence against the defendant, not by asking jurors to convict defendant because of his criminal propensities, but on the basis of the genetic markers he left behind in a variety of similar circumstances over the course of a year. These genetic markers unmistakably identifying defendant as the assailant who claimed the life of Charlotte Murray Pace.” Id. atp. 51, 976 So.2d at 143.

. During the Florida investigation, Det. Bun-ten interviewed Tommy Fields, with whom defendant and his coterie resided in Gibson-ton. Fields stated Michael Garcia is an "unbearable drunk,” with a terrible temper,. whereas his brother, Danil, was a more mellow drunk, "you could talk with him reasonably.” Fields described James Nelson as a follower.

. Appellate counsel's Sentence Review Memorandum relies on "trial observers” to state a jury of eleven Caucasians and one African-American was empaneled to decide defendant's case.